LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 007491
LAW OFFICE OF LISA RASMUSSEN, ESQ.
616 South 8th Street
Las Vegas, NV 89101
Telephone: (702) 471-6565
Facsimile: (702) 471-6540
Lisa@LRasmussenLaw.com

WILLIAM A. BREWER III, ESQ.
Texas State Bar No. 02967035
*Pro Hac Vice to be filed*
MICHAEL J. COLLINS, ESQ.
Texas State Bar No. 00785495
*Pro Hac Vice to be filed*
ROBERT M. MILLIMET, ESQ.
Texas State Bar No. 24025538
*Pro Hac Vice to be filed*
BICKEL & BREWER
1717 Main Street, Suite 4800
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015
Email: wab@bickelbrewer.com
          mjc@bickelbrewer.com
          rrm@bickelbrewer.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## District of Nevada

| | |
|---|---|
| LEONARD C. ADAMS<br>DENISE M. ADAMS,<br>KENNETH ADDES,<br>VICTORIA ADDES,<br>MICHEL F. AIELLO,<br>PATRICIA A. AIELLO,<br>ADIB M. AL-AWAR,<br>ELLEN A. AL-AWAR,<br>DAVID J. ALBIOL,<br>DR. FLORENCE ALEXANDER,<br>DR. STANLEY ALEXANDER,<br>DONNA L. ALLGEIER,<br>ROBERT L. ALLGEIER,<br>KAREN R. ALLISON,<br>BARBARA A. ALTMAN,<br>DANIEL C. ALTMAN,<br>STEVEN C. ALTMAN,<br>AUGUST J. AMARAL,<br>LYNDA GAY ANDERSON,<br>ROBERT P. ANDERSON,<br>ROBERTA J. ANDERSON,<br>ALBERT D. ANDRADE, | ) Case No.   03:22-cv-210<br>)<br>)<br>) **ORIGINAL COMPLAINT AND JURY**<br>) **DEMAND**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

| | |
|---|---|
| 1 | DONNA ARBOGAST, ) |
| | RODNEY J. ARBOGAST, ) |
| 2 | SUZANNE L. ARBOGAST, ) |
| | ALBERT M. ARECHIGA, ) |
| 3 | RICHARD ARMIJO, ) |
| | EDWIN E. ARNOLD, ) |
| 4 | ALLAN ARTHUR, ) |
| | MARY E. ASSELIN, ) |
| 5 | ROBERT J. ASSELIN, ) |
| | MICHAEL AU, ) |
| 6 | CINDY AVENA, ) |
| | THOMAS AVENA, ) |
| 7 | LORETTA D. BACKES, ) |
| | PAUL P. BACKES, ) |
| 8 | PETER L. BACKES, ) |
| | SIGFRIED BAKER, ) |
| 9 | ALTERIO BANKS, ) |
| | DON L. BARNES, ) |
| 10 | MIRIAM M. T. BARNES, ) |
| | JAMES W. BARNES, ) |
| 11 | CLARK BARON, ) |
| | JOYCE BARON, ) |
| 12 | CLARK R. BARTKOWSKI, ) |
| | JEAN P. BARTKOWSKI, ) |
| 13 | GARY R. BARTON, ) |
| | MAVIS J. BARTON, ) |
| 14 | IRENE K. BASS, ) |
| | JOSEPH F. BELLESORTE, ) |
| 15 | MARJORIE Y. BERLIN, ) |
| | DONALD M. BERMAN, ) |
| 16 | JANICE I. BERMAN, ) |
| | JEAN J. BERTHELOT, ) |
| 17 | WILLIAM M. BETTENCOURT, JR., ) |
| | JOAN BETTENCOURT, JR., ) |
| 18 | JAY BETZ, ) |
| | JOY BETZ, ) |
| 19 | ANTHONY BILOTTO, ) |
| | GERALD L. BITTNER, SR., ) |
| 20 | SUSAN I. BITTNER, ) |
| | KAREN G. BLACHLY, ) |
| 21 | CAROLYN N. BLACKMAN, ) |
| | JERRY L. BLACKMAN, SR., ) |
| 22 | DARREL L. BLANCK, ) |
| | YVONEE M. BLANCK, ) |
| 23 | MICHAEL S. BLAU, ) |
| | SHAMIRAN BLAU, ) |
| 24 | CHARMA N. BLOCK, ) |
| | JEROME L. BLOCK, ) |
| 25 | JUDY A. BLOOD, ) |
| | RUSSELL M. BLOOD, ) |
| 26 | CYNTHIA REED BOEGEL, ) |
| | DENNIS W. BOEGEL, ) |
| 27 | BETTY BOESE, ) |
| | JOHN S. BORKOSKI, ) |
| 28 | KATHLEEN K. BORKOSKI, ) |
| | CHARLES E. BOROM, ) |

1   LANNA G. BOROM,                        )
    RICHARD A. BRADBURY,                   )
2   SARAH S. BRADBURY,                     )
    ANN L. BRANT,                          )
3   RAYMOND F. BRANT,                      )
    MICHAEL BRAUNSTEIN,                    )
4   GLEN J. BRECHT,                        )
    JANET BRECHT,                          )
5   JANINE K. BRECHT,                      )
    MARSHALL J. BRECHT,                    )
6   DONALD W. BREHM,                       )
    HANNAH BREHMER,                        )
7   MARILYN BRENNER,                       )
    MICHAEL BRENNER,                       )
8   MICHAEL T. BRIDGES,                    )
    CINDY G. BRINES,                       )
9   MICHAEL R. BRINES,                     )
    DONALD E. BRINEY,                      )
10  PENNY L. BROCK,                        )
    DOREEN C. BROOKS,                      )
11  HOWARD D. BROOKS,                      )
    JOHN P. BROUWERS,                      )
12  JOHN W. BROUWERS,                      )
    ROBERT A. BRYANT, SR.,                 )
13  BRUCE D. BRYEN,                        )
    ELEANOR BUCK,                          )
14  WILLIAM E. BUCK,                       )
    NANCY A. BUECHNER,                     )
15  WILLIAM R. BUECHNER,                   )
    ED BURGESS,                            )
16  ALYCE E. CADWALLADER,                  )
    DAVID S. CADWALLADER                   )
17  VALERIE CALLAHAN,                      )
    JUDITH CANDELARIO,                     )
18  DONNA M. CANGELOSI,                    )
    MARGARET M. CANGELOSI,                 )
19  WILLIAM A. CARONE,                     )
    DOYNE J. CARSON,                       )
20  ELSIE L. CARSON,                       )
    LESLIE A. CARTER,                      )
21  RONALD R. CARTER,                      )
    JAIRO A. CASTILLO,                     )
22  TITO A. CASTILLO,                      )
    MARY ANN CATALANELLO,                  )
23  RALPH F. CATALANELLO,                  )
    JACQUELINE CAUCHOIS,                   )
24  MAURICE CAUCHOIS,                      )
    BARBARA A. CECIL,                      )
25  ROBERT J. CENTANNI,                    )
    SUSAN R. CENTANNI,                     )
26  LEONA M. CHAPMAN,                      )
    TONY CHAUDHRY,                         )
27  PAUL G. CHELEW,                        )
    JOANN CHIAPPETTA,                      )
28  PAT CHIAPPETTA,                        )
    JOHN T. CHIRGWIN,                      )

| | |
|---|---|
| 1 | BARBARA M. CHYLAK, ) |
| | ROBERT T. CHYLAK, ) |
| 2 | BILLIE R. CISLAGHI, ) |
| | CURTIS CLARK, ) |
| 3 | JACK R. CLARK, ) |
| | ROSANNE L. CLARK, ) |
| 4 | DOREEN S. CLENDENING, ) |
| | JOHN P. CLENDENING, ) |
| 5 | DOLORES J. CLIMO, ) |
| | JAMES D. CLIMO, ) |
| 6 | GEORGE S. COHAN, ) |
| | NATALIE H. COHAN, ) |
| 7 | NELSON L. COHEN, ) |
| | MARGARET H. COHN, ) |
| 8 | PETER C. COHN, ) |
| | LARRY COLBORN, ) |
| 9 | LORETTA COLBORN, ) |
| | SHIRLEY M. COLLINS, ) |
| 10 | HOWARD CONNELL, ) |
| | LORENE CONNELL, ) |
| 11 | DANIEL O. CONNER, ) |
| | HAROLD CORCORAN, ) |
| 12 | JOYCE CORCORAN, ) |
| | JOSEPH L. COSTELLO, ) |
| 13 | KAREN COTTRELL, ) |
| | KEVON COTTRELL, ) |
| 14 | FRANKYE D. CRAIG, ) |
| | HOWARD L. CRAIG, ) |
| 15 | PETER C. CRANSTON, ) |
| | CHRISTINE CRAVEN, ) |
| 16 | LEE CRAVEN, ) |
| | SHIRLEY CUPP-DOE, ) |
| 17 | FERNANDO CUZA, ) |
| | KRISTI CUZA, ) |
| 18 | DENISE M. DANIEL, ) |
| | LESLIE S. DANIEL, ) |
| 19 | KLINT THOMAS DANNA, ) |
| | FRANK DAVENPORT, ) |
| 20 | CHESLEY R. DAVIES, ) |
| | MARY E. DAVIES, ) |
| 21 | MARTIN A. DAVIS, ) |
| | VIRGINIA L. DAVIS, ) |
| 22 | NANCY R. DAVIS, ) |
| | PATRICK DAVIS, ) |
| 23 | SUSAN DAVIS, ) |
| | TRACY A. DEBERRY, ) |
| 24 | GARY DEPPE, ) |
| | PETER DELUCA, ) |
| 25 | ANN R. DERY, ) |
| | JAMES D. DERY, ) |
| 26 | DWAYNE H. DEUTSCHER, ) |
| | MICHELLE T. DEUTSCHER, ) |
| 27 | ANNE F. DI SALVO, ) |
| | TAMARA DIAS, ) |
| 28 | MARION B. DITTMAN, ) |
| | LEAH K. DOBYNE, ) |

| | |
|---|---|
| 1 | ROBERT S. DOBYNE, ) |
| | ELIZABETH DOKKEN-BAXTER, ) |
| 2 | MICHAEL DONAHUE, ) |
| | MIEKO DONOVAN, ) |
| 3 | RICHARD DONOVAN, ) |
| | LORETTA DONNOLO, ) |
| 4 | JOSEPH DONNOLO, ) |
| | D. JOSEPH DOUCET, ) |
| 5 | LOUISE M. DOUCET, ) |
| | DAVID B. DOUTT, SR., ) |
| 6 | JOHNINE M. DOUTT, ) |
| | WILLIAM A. DOWNEY, ) |
| 7 | JILL M. DOYLE, ) |
| | PATRICK J. DOYLE, ) |
| 8 | DANIEL T. DRUBIN, ) |
| | LAURA DRUBIN, ) |
| 9 | CHARLES B. DUNN, IV, ) |
| | FORD S. DUNTON, ) |
| 10 | PENNY DUPIN, ) |
| | WILLIAM DUPIN, ) |
| 11 | JACK L. DYSART, ) |
| | MONICA C. EBAUGH, ) |
| 12 | KAREN EBERLIN, ) |
| | RAYMOND J. EBERLIN, ) |
| 13 | ROBERT ROY ECKER, ) |
| | CAROL A. ELLER, ) |
| 14 | JONATHAN M. ELLER, ) |
| | RICHARD L. ENGLISH, ) |
| 15 | DR. DAVID R. ENRICO, ) |
| | DR. BONNY K. ENRICO, ) |
| 16 | DOLORES Y. ERICKSON, ) |
| | WILLIAM F. ERRINGTON, ) |
| 17 | CINDY ESSAFF, ) |
| | ROBERT ESSAFF, ) |
| 18 | MELINDA ESTEVEZ, ) |
| | RICHARD D. ESTEVEZ, ) |
| 19 | JAMES F. EVES, ) |
| | DENISE F. FAGER, ) |
| 20 | BYRNE E. FALKE, SR., ) |
| | BRUCE FALKENBORG, ) |
| 21 | MARGUERITE FALKENBORG, ) |
| | BRENDA FALVAI-POWERS, ) |
| 22 | EMILY T. FARRAH, ) |
| | JOSEPH A. FARRAH, ) |
| 23 | CAROL M. FAVRO, ) |
| | WILLIAM H. FAVRO, ) |
| 24 | CHRISTOPHER J. FERNANDES, ) |
| | DIONISIO A. FERNANDES, ) |
| 25 | FIOLA F. FERNANDES, ) |
| | JASON D. FERNANDES, ) |
| 26 | MELISSA A. FERNANDES, ) |
| | LARRY FERNANDEZ, ) |
| 27 | ARLENE J. FINE, ) |
| | LEWIS H. FINE, ) |
| 28 | KAREN B. FINKEL, ) |
| | RONALD G. FINKEL, ) |

| | |
|---|---|
| 1 | RICHARD T. FIORY, ) |
| | M. EVELYN FISHER, ) |
| 2 | TIMOTHY FOLENDORF, ) |
| | FRED J. FOXCROFT, ) |
| 3 | ROBERTA FOXCROFT, ) |
| | JOHN V. FRAGOLA, ) |
| 4 | EDWARD C. FRASER, ) |
| | JOHN R. FREDERICKSON, ) |
| 5 | BARBARA FREY, ) |
| | DONALD FREY, ) |
| 6 | ALAN B. FRIEDMAN, ) |
| | ROBERT FULLER, ) |
| 7 | THEODORE J. FULLER, ) |
| | JOAN L. FULLER, ) |
| 8 | GLENN W. GABOURY, ) |
| | SHARON M. GABOURY, ) |
| 9 | DARLENE C. GAGE, ) |
| | JERRY L. GAGE, ) |
| 10 | PAUL L. GARCELL, ) |
| | ALEX G. GASSIOT, ) |
| 11 | EDMUND G. GAYLORD, ) |
| | AYLENE GERINGER, ) |
| 12 | MARVIN W. GITTELMAN, ) |
| | TOBY E. GITTELMAN, ) |
| 13 | GALE GLADSTONE-KATZ, ) |
| | ALICIA GOFFSTEIN, ) |
| 14 | ROBERT GOFFSTEIN, ) |
| | NANCY GOLDEN, ) |
| 15 | JACK GOLDENTHAL, ) |
| | SYLVIA GOLDENTHAL, ) |
| 16 | BARRY J. GOLDSTEIN, ) |
| | PATRICIA B. GOLDSTEIN, ) |
| 17 | MARTIN GONSKA, ) |
| | JAMES PAUL GOODE, ) |
| 18 | MICHAEL J. GOODWIN, ) |
| | PAUL D. GRAF, ) |
| 19 | MARGARET A. GRAF, ) |
| | BETTY GRANT, ) |
| 20 | GAIL A. GRAY, ) |
| | ROBERT W. GRAY, ) |
| 21 | EUNICE A. GREENE, ) |
| | NELSON R. GREENE, ) |
| 22 | CLARENCE J. GREENWALD, ) |
| | GERTRUDE R. GREENWALD, ) |
| 23 | CARTER L. GRENZ, ) |
| | ALAN GROH, ) |
| 24 | WYNN A. GUNDERSON, ) |
| | LORRAINE J. GUNDERSON, ) |
| 25 | TOBY A. GUNNING, ) |
| | BARBARA L. GUNTHER, ) |
| 26 | JOANNE HALVORSON, ) |
| | SUZANNE M. HALVORSON, ) |
| 27 | THOMAS L. HALVORSON, ) |
| | DARLENE HAMMOND, ) |
| 28 | KRIS J. HAMPER, ) |
| | GLORIA W. HANDELMAN, ) |

| | |
|---|---|
| 1 | WILLIAM L. HANE, ) |
| | STAN A. HANES, ) |
| 2 | DONNA J. HANSEN, ) |
| | KENNETH L. HANSEN, ) |
| 3 | GAYLE HARKINS, ) |
| | DWIGHT W. HAROUFF, ) |
| 4 | MARY ANN HAROUFF, ) |
| | BEVERLY J. HARRINGTON, ) |
| 5 | SUZE HARRINGTON, ) |
| | THOMAS T. HARRINGTON, ) |
| 6 | MARGUERITE HARRISON, ) |
| | THOMAS B. HARRISON, ) |
| 7 | MARISA D. HARVEY, ) |
| | JEROME L. HARVEY, JR., ) |
| 8 | KEVIN J. HASELHORST, ) |
| | JOHN D. HATHCOCK, ) |
| 9 | SUSAN K. HATHCOCK, ) |
| | CURTIS HATTSTROM, ) |
| 10 | VIRGINIA HATTSTROM, ) |
| | GLENDA G. HAYNES, ) |
| 11 | LEO L. HAYNES, ) |
| | ROLAND HEARN, ) |
| 12 | NADINE HEATON, ) |
| | ROSE O. HECKER, ) |
| 13 | BARBARA HEFFNER, ) |
| | MIKE HEFFNER, ) |
| 14 | JOCELYNE HELZER, ) |
| | JAY E. HENMAN, ) |
| 15 | JUDITH J. HENNEN, ) |
| | VIRGIL P. HENNEN, ) |
| 16 | ALLEN HERD, ) |
| | MARILYN HERD, ) |
| 17 | ALLAN R. HERNDOBLER, ) |
| | SUE HERNDOBLER, ) |
| 18 | BRIAN K. HERNDON, ) |
| | SHARON L. HERNDON, ) |
| 19 | DONALD A. HERRMANN, ) |
| | NANCY E. HERRMANN, ) |
| 20 | JUDITH A. HEYBOER, ) |
| | PHILIP HIGERD, ) |
| 21 | BRENDA J. HIGH, ) |
| | EDWARD O. HIGH, ) |
| 22 | HAMILTON M. HIGH, ) |
| | MARILYN HILBORN, ) |
| 23 | ROBERT W. HILL, ) |
| | JAY P. HINGST, ) |
| 24 | GAIL M. HOCK, ) |
| | JOHN A. HOGLUND, ) |
| 25 | PATRICIA O. HOGLUND, ) |
| | NIENKE HOHMANN, ) |
| 26 | FRED J. HOLLAND, ) |
| | MARJORIE HOLLAND, ) |
| 27 | LISA M. HOLLIFIELD, ) |
| | ANGELA J. HOWARD, ) |
| 28 | EARL HOWSLEY, JR., ) |
| | TODD HUMPHRY, ) |

| | |
|---|---|
| 1 | RICHARD IANNI, ) |
| | YELENA V. ILCHUK, ) |
| 2 | STEPHEN C. IRWIN, ) |
| | EVELYN IVES, ) |
| 3 | JON P. JENSEN, ) |
| | TAMARA L. JENSEN, ) |
| 4 | ARTHUR V. JOHNSON, ) |
| | LARRY W. JOHNSON, ) |
| 5 | MARYLIN JOHNSON, ) |
| | RICHARD A. JOHNSON, ) |
| 6 | RONALD A. JOHNSON, ) |
| | SUSAN A. JOHNSON, ) |
| 7 | DIANE E. JOHNSTON, ) |
| | PHYLLIS JOHNSTON, ) |
| 8 | RODNEY L. JOHNSTON, ) |
| | DEBORAH F. JOSIFKO, ) |
| 9 | MARK R. JOSIFKO, ) |
| | STACI KAISER, ) |
| 10 | BRIGITTE KANEDA, ) |
| | KEN KANEDA, ) |
| 11 | ARTHUR E. KEBBLE, ) |
| | THELMA M. KEBBLE, ) |
| 12 | JOHN KEITH, ) |
| | KATHLEEN KEITH, ) |
| 13 | ANA W. KELLEY, ) |
| | DAVID G. KELLEY, ) |
| 14 | CAROL KESLER, ) |
| | LINDSEY KESLER, JR., ) |
| 15 | C. K. KHURY, ) |
| | RICHARD KIM, ) |
| 16 | WILL KLAUS, ) |
| | CHRISTINE KLAY, ) |
| 17 | OTHMAR KLAY, ) |
| | JAMES T. KLEGA, ) |
| 18 | SHIRLEY KLEGA, ) |
| | BERNARD KLOENNE, ) |
| 19 | CHRISTINA KNOLES, ) |
| | MARCIA J. KNOX, ) |
| 20 | COLETTE KOPF, ) |
| | KLAUS KOPF, ) |
| 21 | HARVEY A. KORNHABER, ) |
| | DOROTHEA K. KRAFT, ) |
| 22 | AL KRAUS, ) |
| | KATRINA KRAUS, ) |
| 23 | COLITA KWIATKOWSKI, ) |
| | DONALD H. KWIATKOWSKI, ) |
| 24 | PAUL KWIATKOWSKI, ) |
| | SANDRA L. KWIATKOWSKI, ) |
| 25 | WENDY KWONG, ) |
| | GERARD LABOSSIERE, ) |
| 26 | LUCILLE LABOSSIERE, ) |
| | DINA LADD, ) |
| 27 | CATHERINE D. LAFAYETTE, ) |
| | JOSEPH B. LAFAYETTE, ) |
| 28 | GLADYS LANZAS, ) |
| | JOSE M. LANZAS, ) |

| | |
|---|---|
| 1 | DOLORES LARSON, ) |
| | GARY LARSON, ) |
| 2 | RUTH ANN LARSON, ) |
| | SIDNEY L. LARSON, ) |
| 3 | JON J. LEE, ) |
| | MILTON H. LEES, III, ) |
| 4 | TRACY LEE, ) |
| | CAROL LEFCOURT, ) |
| 5 | JAMES W. LEHR, ) |
| | JULIE ANN LEHR, ) |
| 6 | KATHLEEN F. LEHRMANN, ) |
| | LARRY D. LEHRMANN, ) |
| 7 | CAROL LEIBY, ) |
| | RICHARD LEIBY, ) |
| 8 | WILLIAM H. LENHART, ) |
| | JORG U. LENK, ) |
| 9 | IRWIN LEVINE, ) |
| | RENEE LEVY, ) |
| 10 | ROBERT LEVY, ) |
| | JAMES H. LIDSTER, ) |
| 11 | PHYLLUS M. LIDSTER, ) |
| | STEVE LINDQUIST, ) |
| 12 | CLAIRE LISEK, ) |
| | DANIEL B. LISEK, ) |
| 13 | NICHOLAS LOADER, ) |
| | IVAN LOEBS, ) |
| 14 | BORIS M. LOKSHIN, ) |
| | MINDY F. LOKSHIN, ) |
| 15 | WILLIAM R. LONG, ) |
| | RICHARD J. LOUGHLIN, ) |
| 16 | ROBERTA L. LOUGHLIN, ) |
| | MARY M. LOWE, ) |
| 17 | ROBERT L. LOWE, ) |
| | JANICE LUCAS, ) |
| 18 | MARK LURIE, ) |
| | BARBARA SUE LUTHI, ) |
| 19 | RICHARD D. LUTHI, ) |
| | THOMAS D. LYNCH, ) |
| 20 | ERIKA G. LYNN, ) |
| | HEIDI MACHOCK ) |
| 21 | SCOTT MACHOCK, ) |
| | ROGIE MADLAMBAYAN, ) |
| 22 | EVAN J. MADOW, ) |
| | DIANE M. MAGUIRE, ) |
| 23 | JOHN J. MAGUIRE, ) |
| | LOU O. MALDONADO, ) |
| 24 | JOHN R. MALLIN, JR., ) |
| | MARIE T. MALLIN, ) |
| 25 | GUIDO MANDARINO, ) |
| | GILBERT MANUEL, ) |
| 26 | CHARLES R. MARADEN, ) |
| | ALEXANDER W. MARCHUK, ) |
| 27 | DOREEN W. MARCHUK, ) |
| | ALAN M. MARKUS, ) |
| 28 | TRENA L. MARKUS, ) |
| | DON P. MARSHALL, ) |

| | |
|---|---|
| 1 | JAMES T. MARTIN, ) |
| | JERROLD T. MARTIN, ) |
| 2 | GERALD B. MARTS, ) |
| | LINDA R. MARTS, ) |
| 3 | GLADYS MATHERS, ) |
| | EDDIE MAYO, ) |
| 4 | MARTI MCALLISTER, ) |
| | JAMES M. MCCONNELL, ) |
| 5 | MAUDRENE F. MCCONNELL, ) |
| | MICHAEL T. MCGRATH, ) |
| 6 | JAMES E. MCKNIGHT, ) |
| | GARY MCMAHON, ) |
| 7 | CHRISTINA F. MCSHAFFREY, ) |
| | HARVEY MCSHAFFREY, ) |
| 8 | BRYAN J. MCWATERS, ) |
| | LISA J. MCWATERS, ) |
| 9 | MARINA MEHLMAN, ) |
| | JOSEPH J. MELZ, ) |
| 10 | LINDA M. MELZ, ) |
| | JACK R. MENNIS, ) |
| 11 | SUSAN A. MENNIS, ) |
| | GERALD B. MERZ, ) |
| 12 | NANCY J. MERZ, ) |
| | MICHAEL J. MESSER, ) |
| 13 | ANDRE MICHAELIAN, ) |
| | ROBERT D. MIERAU, ) |
| 14 | SANDRA J. MIERAU, ) |
| | BARBARA L. MILLER, ) |
| 15 | GARY I. MILLER, ) |
| | GEORGE MINAR, ) |
| 16 | VIRGINIA MINAR, ) |
| | ALBERT J. MINECONZO, ) |
| 17 | MAE MINEO, ) |
| | MICHELLE L. MITCHELL, ) |
| 18 | TODD O. MITCHELL, ) |
| | MATTHEW MOLITCH, ) |
| 19 | JEANNIE M. MONROE, ) |
| | WESLEY L. MONROE, ) |
| 20 | WILLIAM L. MONTGOMERY, JR., ) |
| | GENE MONTOYA, ) |
| 21 | ARTHUR B. MOORE, ) |
| | ERNEST J. MOORE, ) |
| 22 | PATRICK J. MOORE, ) |
| | WILLIAM RICHARD MORENO, ) |
| 23 | ROSALIE A. MORGAN, ) |
| | NADINE MORTON, ) |
| 24 | GEOFFREY MOTT, ) |
| | FRANK J. MURPHY, ) |
| 25 | JAMES MURPHY, ) |
| | MARGARET F. MURPHY, ) |
| 26 | TRACY MURPHY, ) |
| | KARDAKH NATTO, ) |
| 27 | KELLY F. NEAL, ) |
| | CARMEN NEIDIG, ) |
| 28 | DAN F. NELSON, ) |
| | TERI NELSON, ) |

| | |
|---|---|
| 1 | GARY NELSON, ) |
| | LINDA NELSON, ) |
| 2 | GLORIA J. NELSON, ) |
| | JAMES S. NELSON, IV, ) |
| 3 | FRED G. NEUFELD, ) |
| | DANIEL NEWMAN, ) |
| 4 | FREDA NEWMAN, ) |
| | ELSIE D. NEWMAN, ) |
| 5 | LARRY E. NEWMAN, ) |
| | ALEATH NICOSIA, ) |
| 6 | BENJAMIN NICOSIA, ) |
| | RICHARD A. NIELSEN, ) |
| 7 | ALLEN M. NIRENSTEIN, ) |
| | DOROTHY H. NIRENSTEIN, ) |
| 8 | JOHN NIX, ) |
| | LISA NIX, ) |
| 9 | STANLEY M. NOVARA, ) |
| | JOAN NUNES, ) |
| 10 | HENRY OBERMULLER, ) |
| | MENGIA OBERMULLER, ) |
| 11 | CATHLEEN B. O'CONNOR, ) |
| | ROBERT H. O'CONNOR, ) |
| 12 | ROBERT L. OGREN, ) |
| | BETTY R. OGREN, ) |
| 13 | WILLIAM W. OGREN, ) |
| | DAVID M. OLDS, ) |
| 14 | SALLY W. OLDS, ) |
| | KEVIN OLSEN, ) |
| 15 | ANNIE OMAYE, ) |
| | STANLEY OMAYE, ) |
| 16 | ADRIAN J.R. OOSTHUIZEN, ) |
| | CATHERINE OPPIO, ) |
| 17 | JOHN E. O'RIORDAN, ) |
| | SONHILD A. O'RIORDAN, ) |
| 18 | VESLAV ORVIN, ) |
| | AARON I. OSHEROW, ) |
| 19 | PAUL OSTER, ) |
| | DAVID A PALMER, ) |
| 20 | CYNTHIA ANN PARDEE, ) |
| | BETTY R. PARDO, ) |
| 21 | LEXEY S. PARKER, ) |
| | HENRY E. PATTISON, ) |
| 22 | RUTH V. PATTISON, ) |
| | JENNEFER C. PEELE, ) |
| 23 | BILL PENN, ) |
| | ISA PENN, ) |
| 24 | LYNN R. PERLMAN, ) |
| | ROBERT H. PERLMAN, ) |
| 25 | ANDREW R. PETERSON, ) |
| | SHARON PETERSON, ) |
| 26 | ROBERT D. PHILLIPS, ) |
| | HOLLY J. PICKEREL, ) |
| 27 | VICKIE PIEPER, ) |
| | DONALD H. PINSKER, ) |
| 28 | CHARLES B. PLUNKETT, ) |
| | ARTHUR POLACHECK, ) |

| | |
|---|---|
| 1 | GLORIANNE POLACHECK, ) |
| | MARTHA W. POTTER, ) |
| 2 | HANS J. PRAKELT, ) |
| | JAMES C. PRESSWOOD, ) |
| 3 | SHARON E. PRESSWOOD, ) |
| | DENNIS RAGGI, ) |
| 4 | JOHN M. RANDALL, ) |
| | SHIRLEY A. RANDALL, ) |
| 5 | BENITA M. RASHALL, ) |
| | CHARLES P. RASHALL, ) |
| 6 | LINDA K. REDFERN, ) |
| | LINDA S. REED, ) |
| 7 | MICHAEL REED, ) |
| | MARY ANN REES, ) |
| 8 | NOEL E. REES, ) |
| | LINDA C. REID, ) |
| 9 | MICHAEL H. RICCI, ) |
| | JEAN G. RICHARDS, ) |
| 10 | RACHEL RIEHLE, ) |
| | CASSANDRA J. ROBBINS, ) |
| 11 | DONNA R. ROBERTS, ) |
| | ROBERT W. ROBERTS, ) |
| 12 | ALAN ROBINSON, ) |
| | GAIL ROBINSON, ) |
| 13 | ROBERT R. RODRIGUEZ, ) |
| | ELISABETH ROGAL, ) |
| 14 | MICHAEL G. ROGAL, ) |
| | JAMES W. ROGERS, ) |
| 15 | ANITA ROSENFIELD, ) |
| | ARNOLD ROSENTHAL, ) |
| 16 | DAVID ROSNER, ) |
| | MARY E. RUSSELL, ) |
| 17 | BURTON M. SACK, ) |
| | GREGORY V. SAK, ) |
| 18 | JANA L. SAK, ) |
| | MURRAY SALIT, ) |
| 19 | RANDY M. SANCHEZ, ) |
| | SHARON SANCHEZ, ) |
| 20 | HELENA SARMANIAN, ) |
| | PETER SARMANIAN, ) |
| 21 | KENNETH D. SAWYER, ) |
| | HOWARD C. SAYLER, ) |
| 22 | PHYLLIS L. SAYLER, ) |
| | EDWARD J. SCHEIDEGGER, ) |
| 23 | JANET E. SCHNADT, ) |
| | WILLIAM E. SCHNADT, ) |
| 24 | KENNETH SCHULZ, ) |
| | SHIRLEY E. SCHWARTZ, ) |
| 25 | RONALD C. SHACKELFORD, ) |
| | STEVEN A. SHANE, ) |
| 26 | BLANCHE SHAPIRO, ) |
| | IRA JAY SHAPIRO, ) |
| 27 | ROBERT SHAPIRO, ) |
| | JAMES W. SHAW, ) |
| 28 | EVELYN SHEERIN, ) |
| | JOANN SHEERIN, ) |

| | |
|---|---|
| 1 | SYDNEY J. SIEMENS, ) |
| | LESLIE P. SIGGS, ) |
| 2 | ROBERT G. SIKORSKI, ) |
| | ALAN SIMON, ) |
| 3 | CAROL SIMON, ) |
| | ALAN R. SIMMONS, ) |
| 4 | JUDITH B. SIMMONS, ) |
| | BERNARD SINDLER, ) |
| 5 | TARA SINDLER, ) |
| | DARYL B. SISK, ) |
| 6 | BARBARA SKLAR, ) |
| | SUSAN M. SLATER, ) |
| 7 | HERBERT SLOVIS, ) |
| | JULIE B. SLOVIS, ) |
| 8 | BRADFORD H. SMITH, ) |
| | MAGGIE SMITH, ) |
| 9 | JOYCE E. SMITH, ) |
| | JACK SNOW, ) |
| 10 | HEIDI SNOW, ) |
| | ANGELA S. SNYDER, ) |
| 11 | FRANCESCO SORO, ) |
| | BARBARA J. SPECKERT, ) |
| 12 | ROBERT S. SPECKERT, ) |
| | CHARLES J. SPINA, ) |
| 13 | NANCY H. SPINA, ) |
| | CLIFTON H. SPINDLE, ) |
| 14 | VERNA R. SPINDLE, ) |
| | CAROL A. SQUICCI, ) |
| 15 | ARNOLD STAIRMAN, ) |
| | ROSALIND L. STARK, ) |
| 16 | JAY S. STEIN, ) |
| | CYNTHIA M. STEINMETZ, ) |
| 17 | NICHOLAS A. STEINMETZ, ) |
| | DAVID G. STERLING, ) |
| 18 | JOSEPH STERLING, ) |
| | THERESA STERLING, ) |
| 19 | MARY JUDE ) |
| | MICHAEL D. STEWART, ) |
| 20 | GORDON N. STIMPSON, ) |
| | MARJORIE I. STIMPSON, ) |
| 21 | GEORGE F. STONE, ) |
| | MARGARET A. STONE, ) |
| 22 | DENISE STORCH, ) |
| | RALPH R. STORCH, ) |
| 23 | RAND SULLIVAN, ) |
| | ROBERT SULLIVAN, ) |
| 24 | ROBERT A. SUSSKIND, ) |
| | LELAND K. SWANSON, ) |
| 25 | LENA M. SWANSON, ) |
| | DONALD SWEZEY, ) |
| 26 | VIRGINIA SWILLEY, ) |
| | RAY SYFERT, ) |
| 27 | CAROLE TALAN, ) |
| | CYRIL TAMMADGE, ) |
| 28 | ELIZABETH TARR, ) |
| | WAYNE P. TARR, ) |

| | | |
|---|---|---|
| 1 | JOYCE L. TAYLOR, | ) |
| | KERRY S. TAYLOR | ) |
| 2 | KEVIN TAYLOR, | ) |
| | CALVIN TERRILL, | ) |
| 3 | GARY A. THIBAULT. | ) |
| | SANDRA C. THIBAULT, | ) |
| 4 | BRYAN M. THOMAS, | ) |
| | LORI M. THOMAS, | ) |
| 5 | DARYL D. THOMPSON, | ) |
| | GREGORY R. THOMPSON, | ) |
| 6 | WILMA JEAN THOMPSON, | ) |
| | NORMAN TIANO, | ) |
| 7 | DOUGLAS TICHENOR, | ) |
| | SUSAN TICHENOR, | ) |
| 8 | DOROTHY TON, | ) |
| | JAMES G. TON, | ) |
| 9 | RICHARD TRACY, | ) |
| | ANTON TRAPMAN, | ) |
| 10 | IRENE TRAPMAN, | ) |
| | RORY TRIANTOS, | ) |
| 11 | JOHN M. TRIPP, | ) |
| | WARREN W. TRIPP, | ) |
| 12 | CARLOS A. TRUJILLO, | ) |
| | CAROL I. TURNER, | ) |
| 13 | PAUL M. TURNER, | ) |
| | JUDY TURNER, | ) |
| 14 | THOMAS R. TURNER, | ) |
| | NANCY B. VENTURA, | ) |
| 15 | ROY R. VENTURA, | ) |
| | MELODY VIOLET, | ) |
| 16 | MARIETTA VOGLIS, | ) |
| | JACKIE RAY VOHS, | ) |
| 17 | GUNTER VOLPEL, | ) |
| | RICHARD G. VRBANCIC, | ) |
| 18 | ROBERT R. WADE, | ) |
| | SHIRLEY E. WADE, | ) |
| 19 | ELLEN WALLS, | ) |
| | JOSEPH P. WALLS, | ) |
| 20 | DENNIS J. WARD, | ) |
| | PATRICIA A. WARD, | ) |
| 21 | CARL M. WARFIELD, | ) |
| | LAURA W. WARFIELD, | ) |
| 22 | COLLEEN WEAVER, | ) |
| | JOHN WEAVER, | ) |
| 23 | BRIGITTE S. WEBER, | ) |
| | HEINRICH R. WEBER, | ) |
| 24 | NORM WEBSTER, | ) |
| | ARDIS WEIBLE, | ) |
| 25 | DEAN F. WEIBLE, | ) |
| | JERROLD WEINSTEIN, | ) |
| 26 | ANDREW WELCHER, | ) |
| | ROSANNE WELCHER, | ) |
| 27 | LAWRENCE D. WENGERT, | ) |
| | DAWN M. WENGERT, | ) |
| 28 | CONNIE WESTBROOK, | ) |
| | RACHEL WHEELER, | ) |

| | |
|---|---|
| 1 | EUGENE C. WIEHE, ) |
| | BARTON R. WILKINSON, ) |
| 2 | DIANNA J. WILKINSON, ) |
| | JOY WILLIAMS, ) |
| 3 | DORIS E. WINTER, ) |
| | CRAIG WISCH, ) |
| 4 | KATHRYN WOLFE, ) |
| | LARRY WOLFE, ) |
| 5 | MARLIN L. WONDERS, ) |
| | R. YVONNE WONDERS, ) |
| 6 | RICHARD D. WOOD, ) |
| | CYNTHIA WORK, ) |
| 7 | MARYANNE H. WORTHING, ) |
| | RALPH E. WORTHING, ) |
| 8 | ANTHONY P. WYNN, ) |
| | SHERI J. WYNN, ) |
| 9 | ROBERT J. YODER, ) |
| | RICHARD L. YOUNGE, ) |
| 10 | JOSEPH G. ZAPPULLA, ) |
| | CAROL A. ZAPPULLA, ) |
| 11 | KEN ZAWACKI, ) |
| | ANTHONY J. ZERBO, ) |
| 12 | FRANZ J. ZIMMER, ) |
| | and ALL OTHER SIMILARLY SITUATED ) |
| 13 | DIRECT LENDERS REPRESENTED BY BICKEL ) |
| | & BREWER, ) |
| 14 | ) |
| | **Plaintiffs,** ) |
| 15 | ) |
| | v. ) |
| 16 | ) |
| | SILAR ADVISORS, LP, ) |
| 17 | COMPASS PARTNERS, LLC, ) |
| | COMPASS USA SPE, LLC, ) |
| 18 | COMPASS FINANCIAL PARTNERS, LLC, ) |
| | COMPASS FINANCIAL PARTNERS LLC, ) |
| 19 | COMPASS FP CORP., ) |
| | COMPASS USA HOLDING, LLC, ) |
| 20 | COMPASS USA, LP, ) |
| | COMPASS USA GP, LLC, ) |
| 21 | LEONARD MEZEI, ) |
| | DAVID BLATT, ) |
| 22 | BORIS PISKUN, ) |
| | JAY COHEN, ) |
| 23 | RON FRIEDMAN, ) |
| | SILAR SPECIAL OPPORTUNITIES FUND, LP, ) |
| 24 | SMOF A, LLC, ) |
| | SSOP, LLC, ) |
| 25 | ROBERT LEEDS, ) |
| | JAY GRACIN, ) |
| 26 | HIN-KING TAI, ) |
| | CADE LIU, ) |
| 27 | MARK OLSON, ) |
| | WINDEMERE CAPITAL, LLC, ) |
| 28 | OAKBRIDGE CAPITAL INC., ) |
| | ECONOMIC GROWTH GROUP, INC., ) |
| | REPOTEX, INC., ) |
| | SERVICING OVERSIGHT SOLUTIONS, LLC, ) |
| | MICHAEL REINER, ) |
| | TYSON LOMAZOW, ) |

1  CITRON INVESTMENT GROUP, INC.,        )
   MICHAEL CITRON,
2  and DANIELLE CITRON,                  )
                                          )
3                   **Defendants.**        )
   _____

4

5          Plaintiffs, on personal information as to their own actions and on information and belief as to

6  all other matters, for themselves and on behalf of those similarly situated, hereby aver and seek relief

7  against Defendants as set forth below:

8                                          **I.**

9                           **PRELIMINARY STATEMENT**

10         This is the follow-on lawsuit by at least 566 fractional beneficial interest holders ("direct

11  lenders"), as well as other similarly situated direct lenders represented by Bickel & Brewer, to the

12  action pending before the Honorable Robert C. Jones (the "District Court") that is styled *3685 San*

13  *Fernando Lenders, LLC, et al. v. Compass USA SPE, LLC, et al.*, Case No. 2:07-cv-00892-RCJ-

14  GWF ("892 Case").  This action is also "related to" the chapter 7 cases of debtors Asset Resolution

15  LLC ("Asset Resolution") and fourteen related special purpose entities (collectively with Asset

16  Resolution, "Debtors") pending before the District Court in the action styled *In re Asset Resolution*

17  *LLC, et al.*, Case No. BK-S-09-32824-RCJ (the "Bankruptcy Cases").  Plaintiffs are direct lenders in

18  commercial mortgage investment loans (the "Loans") originated and originally serviced by USA

19  Commercial Mortgage Company (collectively, "USACM").  The direct lenders financed the Loans.

20  Defendants were (or are associated with) successors in interest to USACM's loan servicing rights in

21  connection with the Loans.

22         The plight of the direct lenders is well-known to the District Court.  Beginning first with

23  USACM's filing for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

24  Court for the District of Nevada (the Honorable Linda B. Riegle) after it was no longer able to

25  perpetuate its fraudulent activities and conceal from the direct lenders that the Loans were in default,

26  and then continuing with the perpetuation and exacerbation of the harm caused by USACM to the

direct lenders by Defendants, Plaintiffs have been repeatedly victimized by the avarice of their purported loan servicing professionals and their co-conspirators.  Indeed, many direct lenders are retirees who have lost their life savings as a result of Defendants' loan servicing.  Accordingly, by this action, Plaintiffs seek to recover their extensive financial losses.

## II.

### THE PARTIES

**A.    Plaintiffs**

1.    Exhibit A attached hereto lists the named Plaintiffs, all of whom are direct lenders that invested in the Loans.  Plaintiffs reside in numerous states.  Plaintiffs are largely elderly who invested substantial life savings in the Loans.

**B.    Defendants**

2.    Defendant Silar Advisors, LP is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.  Silar wholly owns Asset Resolution.

3.    Defendant Compass Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

4.    Defendant Compass USA SPE, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

5.    Defendant Compass Financial Partners, LLC is a limited liability company that was organized under the laws of the State of Nevada and that had its principal place of business in the State of Nevada.

6.     Defendant Compass Financial Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

7.     Defendant Compass FP Corp. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California.

8.     Defendant Compass USA Holding, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

9.     Defendant Compass USA, LP is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

10.     Defendant Compass USA GP, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

11.     Defendants Compass Partners, LLC, Compass USA SPE, LLC, Compass Financial Partners, LLC (Nevada and Delaware), Compass FP Corp., Compass USA Holding, LLC, Compass USA, LP, and Compass USA GP, LLC are collectively referred to herein as "Compass."

12.     Defendant Leonard Mezei ("Mezei") is a resident of the State of New York and is a principal of Compass.

13.     Defendant David Blatt ("Blatt") is a resident of the State of New York and was a principal of Compass.

14.     Defendant Boris Piskun ("Piskun") is a resident of the State of California and was a principal of Compass.

15.     Defendant Jay Cohen ("Cohen") is a resident of the State of New York and is a principal of Compass.

16.     Defendant Ron Friedman ("Friedman") is a resident of the State of New York and is a principal of Compass.

17.     Defendant Silar Special Opportunities Fund, LP is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

18.     Defendant SMOF A, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. SMOF A, LLC funded Asset Resolution's operations.

19.     Defendant SSOP, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

20.     Defendants Silar Advisors, LP, Silar Special Opportunities Fund, LP, SMOF A, LLC, and SSOP II, LLC are collectively referred to herein as "Silar."

21.     Defendant Robert Leeds ("Leeds") is a resident of the State of New York, is a principal of Silar, and was a pre-petition principal of Asset Resolution.

22.     Defendant Jay Gracin ("Gracin") is a resident of the State of New York, is a principal of Silar, and was a pre-petition principal of Asset Resolution.

23.     Defendant Hin-King Tai ("Tai") is a resident of the State of New York and is a principal of Silar.

24.     Defendant Cade Liu ("Liu") is a resident of the State of New York.  Liu was a former employee of Compass and later became an employee of Silar.

25.     Defendant Mark Olson ("Olson") is a resident of the State of Nevada.  Olson was the Chief Operating Officer and Director of Marketing for USACM, and later became the Director of Investor Relations for Compass.

26.     Defendant Windemere Capital, LLC ("Windemere") is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in the State of Nevada.

27.     Defendant Oakbridge Capital Inc. ("Oakbridge") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Delaware.  Mezei is a principal of Oakbridge.

28.     Defendant Economic Growth Group, Inc. ("EGG") is a corporation organized and existing under the laws of the State of New York, with its principal place of business in the State of New York.  Mezei is the principal of EGG.

29.     Defendant Repotex, Inc. ("Repotex") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. Mezei is a principal of Repotex.

30.     Defendant Servicing Oversight Solutions, LLC ("SOS") is a limited liability company that was organized under the laws of the State of Connecticut and that had its principal place of business in the State of Connecticut.

31.     Defendant Michael D. Reiner ("Reiner") is a resident of the State of Connecticut and was a principal of SOS.

32.     Defendant Tyson Lomazow ("Lomazow") is a resident of the State of New York. Lomazow served as legal counsel to Compass in connection with the Loans from 2007-2008.

33.     Defendant Citron Investment Group, Inc. ("Citron") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in the State of Florida.  Citron was a Florida subservicer for Compass.

34.     Defendant Michael Citron is a resident of the State of Florida and is a principal of Citron.

35.     Defendant Danielle Citron is a resident of the State of Florida and is a principal of Citron.

36.     Michael and Danielle Citron are collectively referred to herein as the "Citron Defendants."

## III.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1334, and 1367.

38.     Venue for this case in this district is proper pursuant to 28 U.S.C. § 1409.

## IV.

## FACTUAL ALLEGATIONS

**A.      Prior Proceedings:   The USACM Bankruptcy, The 892 Case, And The Bankruptcy Cases**

39.     On April 13, 2006, USACM filed for relief under chapter 11 of the Bankruptcy Code.

40.     USACM, which was a licensed mortgage broker under Chapter 645B of the Nevada Revised Statutes, originated and originally serviced the Loans.

41.     Plaintiffs are direct lenders in the Loans.

42.     The Loans were made by USACM on behalf of the direct lenders to third-party borrowers and secured by real property interests.  The Loans are each evidenced by a "Promissory Note Secured By a Deed of Trust" or a "Promissory Note Secured By a Mortgage," which were executed by third-party borrowers in favor of the direct lenders in each of the Loans.  USACM was not a party to the Loans, including the Promissory Notes.  Nevada law expressly governs the Loans.

43.     USACM serviced the Loans pursuant to various Loan Servicing Agreements (the "LSAs") that it entered into separately with each of the direct lenders.  Every direct lender was supposed to execute a single LSA that purported to cover every investment he or she subsequently

made with USACM.   Nevada law expressly governed the LSAs, which were binding on all successors in interest.

44.     Pursuant to an auction held on December 6, 2007, and effective February 16, 2007, Compass acquired as the successful auction bidder:   (i) USACM's loan servicing rights in connection with the Loans pursuant to the LSAs; and (ii) certain fractional beneficial interests held by an affiliate of USACM in the Loans (collectively, the "Purchased Assets").   Compass's acquisition of the Purchased Assets was approved by Judge Riegle in a "Confirmation Order" entered on January 8, 2007, which was later affirmed on appeal by the District Court (Judge Jones and the Honorable Philip M. Pro).

45.     On May 21, 2007, as a result of Compass's extensive loan servicing misconduct to the financial detriment of the direct lenders, the 892 Case was commenced.   The 892 Case sought declaratory relief regarding (i) the ability of the direct lenders to terminate Compass (and later Asset Resolution) as their loan servicer under the LSAs and (ii) the loan servicing compensation allegedly owed to their loan servicer under the LSAs and the Loans, as well as damages.

46.     On August 29, 2007, the District Court affirmed the Confirmation Order.   In doing so, the District Court determined, among other things, that the ability of the direct lenders to terminate their loan servicer under the LSAs, as well as the right of the loan servicer under the LSAs to receive default interest and late fees as loan servicing compensation, were matters of contract interpretation, not plan confirmation, and thus the Confirmation Order did not purport to interpret the LSAs to define Compass's contractual rights under the LSAs.   In other words, Compass acquired the LSAs without modification of their terms.

47.     On November 6, 2007, the District Court entered a Preliminary Injunction in the 892 Case that protected Compass from being terminated as the loan servicer under the LSAs, but enabled 51% or more of the direct lenders in each of the Loans to move for termination of their loan servicer.

The Preliminary Injunction also required Compass to hold in trust for the direct lenders, and not disburse without "further order of this Court," certain disputed funds (the "Trust Funds").

48.      For much of 2008, a District Court-approved standstill existed in the 892 Case while the parties engaged in a District Court-ordered mediation process and the District Court-appointed receiver analyzed the parties' claims and sought the parties' approval of a proposed class action settlement.  Those settlement efforts were ultimately unsuccessful and the litigation of the 892 Case proceeded anew beginning in January 2009.

49.      In February 2009, when Silar and Asset Resolution sought the approval of the District Court in the 892 Case to move the Trust Funds from one account into loan specific sub-accounts for greater transparency to the direct lenders, they represented that they "understand and acknowledge that funds will not be distributed from these accounts without further order of the Court."

50.      In April 2009, pursuant to Silar's motion, the District Court in the 892 Case acknowledged, but did not approve, the substitution of Asset Resolution for Compass as the loan servicer under the LSAs, but added Silar and Asset Resolution as parties to the Preliminary Injunction over which it had in personam jurisdiction and for whose protection the Preliminary Injunction extended.  The Court added Silar to the Preliminary Injunction because it was concerned that Asset Resolution was "just a shell" being interposed to protect Silar from liability, and to make clear that the termination of the loan servicing rights under the LSAs would also eliminate any interest that Silar had in those rights.

51.      On July 6, 2009, the District Court made summary judgment rulings from the bench in the 892 Case that were adverse to the loan servicer under the LSAs.  Those summary judgment rulings were later memorialized in written orders issued on September 18, 2009, and August 4, 2010.  Specifically, the District Court ruled that, pursuant to the compensation provisions of the LSAs, the loan servicer was not entitled to collect default interest and late charges as servicing compensation in connection with the Loans if the amount ultimately collected was less than the full principal amount

of the Loans.  The District Court also ruled that the loan servicer under the LSAs was not entitled to collect default interest and late charges as servicing compensation directly from the direct lenders. The District Court further ruled that, for each of the Loans, the loan servicer under the LSAs was entitled to receive only one accrued annual servicing fee, to be calculated by multiplying the weighted average of the servicing fee percentages specified in the applicable LSAs for one year by the total amount ultimately collected on the Loans.  Finally, the District Court ruled that the loan servicer under the LSAs was the direct lenders' fiduciary when handling any monies it collected on the Loans.

52.     On August 28, 2009, the District Court in the 892 Case approved the conveyance of title to the collateral securing the "Gess" Loan based on a sale price of $8.5 million, and determined that Asset Resolution was entitled to recover a total of only approximately $1.5 million in servicing fees and advances from those sale proceeds, including only $94,000 as a servicing fee.   Asset Resolution had claimed that under the LSAs it was entitled to retain all those sale proceeds (after paying off a tax lien in the amount of approximately $2 million).

53.     On October 14, 2009, Debtors commenced the Bankruptcy Cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

54.     In its accompanying Statement of Financial Affairs, Asset Resolution disclosed under penalty of perjury that, on September 3, 2009, it disbursed approximately $950,460 of those Trust Funds to itself – without further order of the District Court in the 892 Case.

55.     On November 24, 2009, venue of the Bankruptcy Cases was transferred from New York to the District of Nevada.

56.     At an evidentiary hearing held in the Bankruptcy Cases on December 14, 2009, Tai testified that the principals of Silar are the primary owners of SOS and, therefore, SOS is an "affiliate" of Silar because Silar wholly owns Asset Resolution.

57.     On January 5, 2010, the District Court from the bench immediately withdrew the reference to the entirety of the Bankruptcy Cases, and modified the automatic stay to allow the 892 Case to proceed to a final conclusion.  On January 25 and 28, 2010, the District Court issued written orders in the Bankruptcy Cases withdrawing the reference and modifying the automatic stay, respectively.

58.     On January 19, 2010, the District Court ruled from the bench that it was immediately converting the Bankruptcy Cases.  On January 29, 2010, the District Court entered its nunc pro tunc "Conversion Order," pursuant to which the Bankruptcy Cases were converted to chapter 7 cases under the Bankruptcy Code, and William A. Leonard, Jr. was appointed as bankruptcy trustee.

59.     On January 21, 2010, the District Court entered its "Termination Order" in the 892 Case, pursuant to which it concluded that more than 51% of the direct lenders in 29 outstanding Loans had terminated Compass and Asset Resolution as their loan servicers under the LSAs.  The District Court determined that good cause was not needed to terminate Compass and Asset Resolution as the loan servicers under the LSAs because, pursuant to Nevada's "51% Rule," the direct lenders always retained management control of their Loans by being able to designate a new loan servicer upon the approval of at least 51% of the direct lenders in each of the Loans.

60.     On January 25, 2010, the District Court vacated its Preliminary Injunction entered in the 892 Case.  That order was subsequently stayed pending appeal by the Ninth Circuit Court of Appeals.

61.     On February 8, 2010, the District Court entered in the Bankruptcy Cases its "51% Rule Order" specifying how the direct lenders were to implement the 51% Rule under Nevada law to reclaim management control of their outstanding Loans.  The District Court subsequently approved the assumption of the servicing of 27 outstanding Loans by new servicing agents approved by at least 51% of the direct lenders, and placed the chapter 7 trustee in nominal control of the handful of

other outstanding Loans pending the direct lenders' approval of new servicing agents for those few remaining Loans.

62.     On May 25, 2010, the District Court entered in the Bankruptcy Cases its order imposing sanctions against Silar, Leeds, Gracin, and Debtors' general and special bankruptcy counsel for their roles in connection with the improper filing of the Bankruptcy Cases under chapter 11 of the Bankruptcy Code.  The District Court determined that the filing of the Bankruptcy Cases was undertaken in bad faith to escape its jurisdiction over the LSAs, the Loans, and the parties, and was also frivolous.  The District Court imposed sanctions against those parties, and in favor of the direct lenders, in the total amount of $279,615.47, as well as required Debtors' general and special bankruptcy counsel to disgorge to the bankruptcy trustee their respective $300,000 pre-petition retainers.  The District Court's sanctions order was subsequently stayed pending appeal upon those parties depositing into the registry of the District Court separate supersedeas bonds in the amounts of $349,519.34, $208,614.55, and $349,519.34.

63.     On June 9, 2010, the District Court entered additional summary judgment rulings in the 892 Case.  Among other rulings, the District Court determined that USACM, Compass, and Asset Resolution were required under Nevada law to have, but lacked, valid powers of attorney to service the Loans for the direct lenders.  The District Court also concluded that Silar was the title owner of the Purchased Assets and Compass was its loan servicing agent under the LSAs in connection with the Loans.  As a result, and based on the terms of the predominant "Type 4" LSAs, Silar was liable for the loan servicing misconduct undertaken by Compass within the scope of its agency relationship with Silar.  The District Court further concluded that, pursuant to Silar's assignment of its rights and interests in, and obligations under, the Purchased Assets to Asset Resolution, Silar lacked standing to assert any counterclaims against the direct lenders for their purported interference with the Purchased Assets.  The District Court also determined that Silar and Asset Resolution could not prevail as a matter of law on their contract and tort counterclaims against

the direct lenders based on the 51% Rule, Nevada law recognizing that a party may justifiably exercise and act to protect its rights, and the terms of the LSAs, and because Silar and Asset Resolution could not establish that the direct lenders caused their alleged damages.  Finally, the District Court held that the "Plaintiff LLCs" (which had commenced the 892 Case) had lost their standing to sue because they had forfeited their right to transact business in Nevada.

64.    On June 24, 2010, the District Court enforced the Conversion Order, requiring the chapter 7 trustee to disburse the Trust Funds to the direct lenders (and limited others) because, pursuant to the District Court's summary judgment rulings in the 892 Case, the loan servicer under the LSAs was not entitled to those funds as claimed servicing compensation – *i.e.*, default interest and late charges – because the direct lenders had not been repaid, and those funds were insufficient to repay, the entire principal balance for the particular Loans.

65.    On September 13, 2010, the District Court ruled from the bench in the 892 Case that it would not allow the former individual members of the Plaintiff LLCs to be substituted as named party plaintiffs in the 892 Case pursuant to Federal Rule of Civil Procedure 25(c).  Instead, the District Court indicated that those direct lenders would have to pursue their damages claims in a new lawsuit, necessitating this action.

66.    The 892 Case proceeded to a jury trial on November 16, 2010.  On December 14, 2010, a nine-person jury found Silar and/or Asset Resolution liable for breaches of contract, breaches of the implied covenant of good faith and fair dealing in contract and in tort, breaches of fiduciary duties, conversion, and civil conspiracy in connection with their servicing of certain Loans pursuant to the LSAs.  As a result, and based on the Court's pretrial determination that Compass, Blatt, and Piskun were in default and, thus, liable as a matter of law, the jury awarded Plaintiffs a total of approximately $79,000 in compensatory damages, excluding attorneys' fees, and a total of $5.1 million in punitive damages.  Defendants are collaterally estopped from contesting the jury's findings of liability in connection with the Loans.

67.     Following the jury's verdict, the District Court indicated its intention to publish a declaratory judgment order discussing the ability of the direct lenders to terminate their loan servicers under the LSAs without good cause pursuant to the 51% Rule, the limited loan servicing compensation to which the loan servicers under the LSAs were entitled, the inability of mortgage brokers and loan servicers (such as Compass, Silar, and Asset Resolution) to place their financial interests in priority to those of the direct lenders, the lack of requisite powers of attorney held by the loan servicers under the LSAs, the inability of Silar and Asset Resolution to pursue damages claims against the direct lenders, and Silar's liability for Compass's loan servicing misconduct.

68.     Based on the jury's findings and the District Court's anticipated declaratory judgment order, the District Court is also expected to award substantial attorneys' fees to the prevailing plaintiffs in the 892 Case pursuant to the terms of the LSAs.

**B.      Defendants' Wrongful Loan Servicing Enterprise**

**1.      Compass and Silar form their wrongful loan servicing enterprise.**

69.     Compass and Silar operated their loan servicing enterprise from their offices, which were both located at 333 7th Avenue, Third Floor, New York, New York 10001.  Silar leased its premises from Mezei, who owned that entire office space.  Repotex and EGG also have their offices at that same address.

70.     Silar funded Compass's acquisition of the Purchased Assets pursuant to a certain Master Repurchase Agreement ("MRA") and various related instruments, resulting in Silar obtaining ownership of the Purchased Assets and Compass servicing the Loans on behalf of the direct lenders as the loan servicing agent of Silar, as the District Court determined as a matter of law in the 892 Case.

71.     Silar's initial funding of Compass's acquisition of the Purchased Assets was based on:  (i) a "first tier" financing of $38 million, pursuant to which an $18.5 million investment was made by the Gottex ABL Master Fund, another $18.5 million investment was made by the Gottex

ABL Cayman Fund, and Silar Advisors, LP contributed $1 million (all of which accrued 18% interest per annum); (ii) a "second tier" financing of $12.5 million, pursuant to which Silar Special Opportunities Fund, LP funded $10 million as "Class A Preferred," with 27.5% compounded monthly interest, and funded another $2.5 million as "Class B Preferred," with 30% compounded monthly interest; and (iii) a "third tier" financing of $1.8 million by Compass USA Holding, LLC.

72.     Pursuant to a Global Paying Agency Agreement, such initial funding was to be repaid in accordance with that three tier financing, such that the first tier would be repaid first and the third tier would be repaid last.  The repayment of the second and third tiers would be to Silar and Compass in accordance with their limited partnership interests in Compass USA, LP.  Silar Special Opportunities Fund, LP and Compass USA Holding, LLC were the limited partners of Compass USA, LP.  SSOP, LLC succeeded to Silar Special Opportunities Fund, LP's interest in Compass USA, LP in or about September 2008.

73.     After its original funding source dropped out in late January 2007, Compass was desperate to secure funding to complete its acquisition of the Purchased Assets and not lose its non-refundable $6 million good faith deposit.  Thus, Compass agreed to the extreme funding and repayment terms offered by Silar.  That arrangement compelled Compass and Silar to undertake their wrongful loan servicing enterprise to realize any profits from the acquisition of the Purchased Assets.

**2.      Compass was a corporate labyrinth directed and overseen by Mezei.**

74.     Compass engaged in its wrongful loan servicing enterprise through a multitude of separate companies.  Specifically, Compass Partners, LLC assigned the Purchased Assets to Compass USA SPE, LLC, an otherwise asset-less corporate shell, but purported to service the Loans through its sub-servicers Compass Financial Partners, LLC (both Nevada and Delaware) and Compass FP Corp., whose sole member and shareholder, respectively, are Compass Partners, LLC.

In addition, Compass Partners, LLC is the manager of Compass USA GP, LLC, which is the general partner of Compass USA, LP, in which Compass USA Holding, LLC was a limited partner.

75.     Compass was operated on a day-to-day basis by two of its principals, Piskun and Blatt.  Cohen and Friedman were also principals of Compass involved in, and Liu and Olson were substantial participants in, the wrongful loan servicing enterprise operated by Compass.

76.     Mezei, however, was the key principal of Compass.  Mezei is the President of Compass Partners, LLC.  Mezei secured the funding from Silar for Compass's acquisition of the Purchased Assets, and executed a personal guaranty in support of such funding.  Mezei was also involved in, directed, and oversaw all significant loan servicing decisions made by Compass.

**3.     Silar takes control from Compass of the operation and management of the loan servicing enterprise, which is directed and overseen by Leeds.**

77.     In late September 2008, while the 892 Case was pending, Silar formed its wholly-owned subsidiary Asset Resolution, and assigned all its rights and interests in, and obligations under, the Purchased Assets, including all its causes of action in connection with the Purchased Assets, to Asset Resolution.  Asset Resolution then purported to foreclose on Compass's interests in the Purchased Assets and assume all the rights and obligations attendant to owning the Purchased Assets, including all the liabilities resulting from the loan servicing enterprise operated and managed by Compass.  Indeed, Asset Resolution asserted that it was entitled to recover, and pursued (and continues to pursue) the recovery of, all loan servicing compensation owed to, and all servicing advances made by, Compass in connection with the Loans.

78.     Silar formed Asset Resolution merely to be an empty corporate shell in which Silar would hold the Purchased Assets.  The purpose of that corporate shell game was so Silar could obtain the benefit of ownership of the Purchased Assets, while purporting to avoid the liabilities incurred in connection with the Purchased Assets.  Asset Resolution had no employees, and was operated, administered, and controlled by Silar – primarily Leeds, Gracin, and Tai – until January

19, 2010, when the District Court converted the Bankruptcy Cases, which were filed under chapter 11 of the Bankruptcy Code on October 14, 2009, to cases under chapter 7 of the Bankruptcy Code, resulting in the appointment of a bankruptcy trustee.  Thus, until January 19, 2010, Asset Resolution was a mere instrumentality or alter ego of Silar.

79.     Also in late September 2008, because Asset Resolution was merely an empty corporate shell, Silar formed SOS to act as the day-to-day sub-servicer for Asset Resolution in connection with the Loans.  SOS was operated, administered, and controlled by Silar, including Leeds, Gracin, and Tai.  Reiner was the manager of SOS.  Thus, SOS was a mere instrumentality or alter ego of Silar.  SOS was subsequently dissolved and its assets were disbursed to Leeds, Gracin, and Tai.

80.     As President and CEO of Silar, Leeds was involved in, directed, and oversaw all significant loan servicing decisions made by Silar (and Asset Resolution and SOS) in connection with the loan servicing enterprise.

**4.     Other professionals conspired with Compass and Silar to perpetuate their loan servicing enterprise.**

81.     Compass's and Silar's wrongful loan servicing enterprise was assisted by the legal advice of Lomazow, who rendered legal opinions that purported to justify their misconduct.

82.     Compass's and Silar's wrongful loan servicing enterprise was assisted by Windemere, which is a Nevada-licensed mortgage broker that Compass and Silar (and Asset Resolution and SOS) used to sub-service the Loans in purported compliance with the District Court's Preliminary Injunction in the 892 Case.

83.     As a result of the wrongful loan servicing enterprise, Oakbridge purchased fractional beneficial interests in various Loans at substantial discounts.

84.     In or about June 2008, Repotex purchased the remaining participation interest held by the Gottex ABL Master Fund in the first tier financing of the Purchased Assets for $8,375,000.  EGG

funded Repotex's purchase.  Those transactions resulted in the disappearance of Mezei's personal

guaranty in connection with the Purchased Assets.

**5.**   **The wrongful loan servicing enterprise seeks to defraud Plaintiffs.**

**a.**   **Defendants seek to defraud Plaintiffs with respect to the "Standard Property" Loan.**

85.   On February 27, 2006, the Standard Property borrower executed a Promissory Note

Secured by Mortgage in the principal amount of $17,750,000 that provided for an interest rate of

12.5% per annum.  Pursuant to section 4 of the Note, all payments on the Note were to be applied

first toward the payment of accrued interest.  As of February 16, 2007, the total remaining principal

balance of the Standard Property Loan was $9,640,000.  The Loan was resolved in March 2007.

86.   Specifically, on March 20, 2007, the Standard Property borrower resolved the Loan

by paying:  (i) the Standard Property direct lenders 100% of their outstanding principal, but no

accrued interest; and (ii) Silar over $870,000 as loan servicing compensation (*i.e.*, default interest,

late charges, and other fees) that was purportedly owed to the loan servicer under the LSAs.

87.   The Standard Property borrower made that payment to Silar pursuant to a secret "side

deal" that was not disclosed in the letter, dated March 7, 2007, that Compass sent through the United

States mail to the Standard Property direct lenders in which they were asked to, and did, consent to

the repayment of 100% of the outstanding principal, but no accrued interest, in full satisfaction of the

Loan.  The intent of the letter was to avoid paying additional collected sums to the Standard Property

direct lenders as accrued regular interest as required by section 4 of the Note.

88.   In fact, on May 18, 2007, Compass sent through the United States mail its first loan

status report to the direct lenders.  In that report, Compass discussed the Standard Property Loan as

one of its "Loan Payoff Successes," stating in full:  "The Borrower paid 100% of the Unpaid

Principal Balance with the consent of 100% of the Direct Lenders, as provided by the Loan

Agreement and Loan Servicing Agreement.  This settlement also retired a lawsuit filed against the

Direct Lenders by the Borrower."  Again, Compass did not disclose to the Standard Property direct lenders the existence of the secret side deal that resulted in the Standard Property borrower paying over $870,000 to Silar instead of the Standard Property direct lenders as required by section 4 of the Note.

           **b.**      **Defendants seek to defraud Plaintiffs with respect to the "Fiesta Oak Valley" Loan.**

89.    USACM originated the Fiesta Oak Valley Loan in June 2004.  As of February 16, 2007, the unpaid principal balance of the Loan was $20,500,000 and accrued regular interest was approximately $6,600,000.

90.    On March 2, 2007, counsel for Vindrauga Corporation, an affiliate of Debt Acquisition Company of America, sent a letter to Compass purporting to terminate Compass as the loan servicer of the Fiesta Oak Valley Loan pursuant to the "Surviving Section 3 Right" set forth in the Bankruptcy Court's Confirmation Order.  The letter advised Compass that more than 51% of the fractional beneficial interest in the Fiesta Oak Valley Loan had elected to substitute Vindrauga for Compass as the loan servicer for the Loan.

91.    On March 23, 2007, Compass sent through the United States mail a letter to the Fiesta Oak Valley direct lenders in which it stated that a third party wanted to purchase their fractional beneficial interests in the Loan in an amount that was 91% of the unpaid principal balance, which was equivalent to a 68% discount because the offer did not include payment for the entire principal balance or any accrued regular interest.  That third party was Oakbridge.

92.    On March 22, 2007, however, the Fiesta Oak Valley borrower had informed Compass that it intended to pay off the Fiesta Oak Valley Loan in full by July 2007.  In an internal e-mail, Compass recognized that the disclosure of that information to the Fiesta Oak Valley direct lenders would make it more difficult to purchase their fractional beneficial interests in the Fiesta Oak Valley

Loan at a substantial discount.  As a result, Compass schemed to misrepresent the status and value of the Fiesta Oak Valley Loan to the Fiesta Oak Valley direct lenders.

93.     On April 4, 2007, Compass sent through the United States mail a loan status report to the Fiesta Oak Valley direct lenders which misrepresented the status and value of the Fiesta Oak Valley Loan and indicated that expensive foreclosure efforts against the borrower would likely need to be initiated.  Specifically, Compass knew that the Fiesta Oak Valley borrower was intending to pay off the Loan in full and that the value of the collateral securing the Loan exceeded $200,000,000.  Compass, however, failed to disclose that information to the Fiesta Oak Valley direct lenders.

94.     As of March 14, 2007, Compass was not a direct lender in the Fiesta Oak Valley Loan.  However, by early May 2007, Compass, Oakbridge, and Mezei had acquired more than 51% of the fractional beneficial interests in the Fiesta Oak Valley Loan, precluding Vindrauga from exercising the Surviving Section 3 Right to terminate Compass as the loan servicer for the Loan. Compass, Oakbridge, and Mezei acquired that fractional beneficial interest in the Fiesta Oak Valley Loan at a substantial discount as a result of Compass's misrepresentations to the Fiesta Oak Valley direct lenders, to their financial detriment.

95.     Silar funded Compass's acquisition of fractional beneficial interests in the Fiesta Oak Valley Loan.  Silar did so after being notified by Compass of the true status and value of the Fiesta Oak Valley Loan.  Silar thereafter purchased the more than 51% fractional beneficial interest in the Fiesta Oak Valley Loan held by Compass, Oakbridge, and Mezei, and then sold that interest for a substantial profit, to the financial detriment of the Fiesta Oak Valley direct lenders.

c.     **Defendants seek to defraud Plaintiffs with respect to the "Shamrock" Loan.**

96.     On March 23, 2007, Compass sent a misleading letter through the United States mail to the Shamrock direct lenders seeking their approval to accept a "third party" offer to purchase the

Shamrock Loan for 88% of the outstanding principal balance and no accrued interest.  That third party was Oakbridge.  That letter was misleading because Compass knew, but did not disclose, that the buyer was willing to pay 100% of the Shamrock direct lenders' outstanding principal balance and all accrued interest, plus certain other fees.  That letter was also misleading because it did not disclose that the collateral securing the Shamrock Loan was worth millions of dollars more than the unpaid principal balance.  Compass had such knowledge because it had negotiated an agreement with the third party pursuant to which the third party would purchase the Shamrock property in a foreclosure sale for the entire value of the Loan, *i.e.*, for the outstanding principal balance and all due and owing accrued interest, default interest, late fees, and other fees.

97.    When only some Shamrock direct lenders accepted the 88% purchase offer, Compass proceeded to foreclose on the Shamrock property to effectuate the sale to the third party.  Silar aided this scheme by providing funds to Compass to remove a tax lien that would have prevented Compass from initiating foreclosure proceedings and effectuating the foreclosure sale to the third party in full satisfaction of the amounts due and owing in connection with the Shamrock Loan.

98.    In March 2008, Compass wrongfully retained possession of substantial proceeds from the sale of the Shamrock property to which it was not entitled.  Pursuant to the Shamrock Promissory Note, all payments on the Shamrock Loan were to be applied first to accrued regular interest, then to unpaid collection costs and late charges, and any remaining amount to outstanding principal.  Moreover, the loan servicer under the LSAs was not entitled to any late charges or default interest unless those sums were "collected from the borrower," rather than, like here, from a third party pursuant to a foreclosure sale.

d.    **Defendants seek to defraud Plaintiffs with respect to the "Anchor B" Loan.**

99.    On May 31, 2005, USACM originated a loan in the amount of $5,850,000 to Anchor B, LP.

100.     On January 14, 2008, Compass foreclosed on the Anchor B property on behalf of the Anchor B direct lenders.

101.     In September 2009, through the use of interstate wires, Asset Resolution, by Reiner, sought, and purported to obtain, the verbal consent of at least 51% of the Anchor B direct lenders to sell the Anchor B property to a third party buyer for $1.9 million.  Because it purported to have the consent of at least 51% of the Anchor B direct lenders, Asset Resolution sold the Anchor B property for $1.9 million on September 30, 2009.

102.     Asset Resolution, however, lacked the consent of at least 51% of the Anchor B direct lenders to sell the Anchor B property.  Three Anchor B direct lenders – who accounted for 6.43% of that purported 51% verbal authorization to sell the Anchor B Property – actually voted against the sale of the Anchor B property several days prior to September 30, 2009.

103.     After the sale of the Anchor B Property was consummated, Asset Resolution improperly claimed all the net sale proceeds in the amount of $457,526.36 as a purported "base servicing fee," and paid $374,102.43 of those proceeds to its then-litigation counsel Greenberg Traurig LLP for "September and October," even though Greenberg Traurig was not the responsible counsel for the Anchor B property.

       **e.**       **Defendants seek to defraud Plaintiffs with respect to the "Gramercy" Loan.**

104.     On June 25, 2004, USACM originated a loan to Gramercy Court, Ltd. that eventually totaled $34,885,500.  Compass subsequently foreclosed on the Gramercy property, which is a 220-unit condominium project that is comprised of two five-story buildings each containing 110 condominium/apartment units.

105.     Following the foreclosure of the Gramercy property, Defendants wrongfully allowed tax liens to be asserted in the total amount of approximately $2.6 million, mechanic's liens to be asserted in the total amount of approximately $1.7 million, and liability insurance to lapse.

106.     Although the Gramercy property generated excess cash flow of approximately $40,000 per month, only one of the two buildings was being leased. That is because Defendants had erroneously informed the Gramercy direct lenders by mail and interstate wire communications that it would require $5 million to get the second building ready to lease, which was cost prohibitive, and therefore advised that the Gramercy direct lenders should sell the Gramercy property. In fact, the cost to get the second building ready to lease was less than $700,000. Thus, Defendants' actions resulted in the Gramercy direct lenders losing years of substantial rental income that would have been realized from the completion of the second building.

107.     In addition, instead of the cash realized from the Gramercy property being paid to the Gramercy direct lenders as rental income or used to pay the property taxes and the mechanic's liens, Defendants have wrongfully taken, and not accounted for, the cash generated by the Gramercy property to the financial detriment of the Gramercy direct lenders.

### f.     Defendants seek to defraud Plaintiffs with respect to the "Trust Funds."

108.     The Preliminary Injunction entered in the 892 Case required the loan servicers under the LSAs to escrow, and not disburse except upon further order of the District Court, the Trust Funds. Silar and Asset Resolution subsequently acknowledged that they were bound by that requirement when they sought and successfully obtained in the 892 Case the District Court's approval to move the Trust Funds from one account into specific sub-accounts for the Loans for greater transparency to the direct lenders.

109.     On September 3, 2009, however, Asset Resolution wrongfully paid itself $950,439.32 from the Trust Funds as purported loan servicing compensation to which it was not entitled. Asset Resolution did so without further order of the District Court, as required by the Preliminary Injunction entered in the 892 Case.

## C.   Defendants' Additional Loan Servicing Misconduct

### 1.   Defendants generally engaged in extensive loan servicing misconduct.

110.   As described herein, Defendants engaged in extensive loan servicing misconduct, individually and in concert, to enrich themselves to the financial detriment of the direct lenders. Silar is vicariously liable for the loan servicing misconduct described herein that its servicing agent Compass perpetrated within the scope of its agency relationship with Silar.  Silar is also liable for the loan servicing misconduct described herein that was undertaken by Asset Resolution and SOS as they were mere instrumentalities or alter egos of Silar.  Compass and Silar are also liable for any loan servicing actions taken or not taken by their sub-servicers.

111.   Defendants purported to act as the direct lenders' loan servicers in connection with the Loans even though they lacked the required powers of attorney to do so.  Given the lack of such authority, Defendants wrongfully took actions and incurred obligations and liabilities on behalf of the direct lenders in connection with the Loans.  Defendants' lack of such authority also precludes Defendants from pursuing claims for recovery of purported loan servicing compensation owed to them pursuant to the LSAs in connection with the Loans.

112.   Defendants failed to act in compliance with their fiduciary duties to the direct lenders when handling funds in connection with the Loans.  Among other things, Defendants wrongfully took and retained funds as purported loan servicing compensation to which they were not entitled, and have not properly accounted for funds received in connection with the Loans.

113.   In addition, Defendants failed to act in accordance with their contractual and statutory obligations to obtain the consent of at least 51% of the direct lenders in the Loans to take actions on their behalf in connection with the Loans.  Among other things, Defendants failed to seek such consent in connection with proposed discounted payoffs made by borrowers, the pursuit of foreclosure proceedings, the modification of the terms of the Loans, the sale of foreclosed-upon

collateral securing the Loans, and advances made to borrowers and other third parties related to the Loans.

114.    Defendants failed to act in accordance with their contractual and statutory obligations to disclose all proposed discounted payoffs made by the borrowers to the direct lenders, and to accept all proposed discounted payoffs that more than 51% of the direct lenders instructed Defendants to accept on their behalf.  Defendants failed to disclose and accept such proposed discounted payoffs because they did not include millions of dollars in default interest, late charges, and other fees to which Defendants wrongfully claimed to be entitled.

115.    Defendants failed to evaluate and resolve the defaulted Loans in a timely manner when the direct lenders were enjoined by the Preliminary Injunction from doing so because Defendants intended for the Loans to accrue additional amounts of default interest and late charges to which Defendants wrongfully claimed to be entitled.  Indeed, although Compass paid $8 million for the loan servicing rights under the LSAs on February 16, 2007, Compass claimed to be entitled to more than $120 million in loan servicing compensation in connection with the Loans in an accounting filed with the District Court on November 15, 2007.  As a result, the value of the collateral securing the Loans depreciated substantially when the economy and the commercial real estate market subsequently experienced a significant downturn, causing Plaintiffs to suffer millions of dollars in damages across the portfolio of outstanding Loans.

**2.    Defendants engaged in loan servicing misconduct in connection with the "Lerin Hills" Loan.**

116.    In December 2005, USACM originated a $10,350,000 loan to Lerin Hills, Ltd. that was secured by a second lien on certain real estate.  USACM and the Lerin Hills borrower subsequently negotiated a settlement payoff pursuant to which the borrower agreed to pay $9,552,824.38, which amounted to 93% of the principal balance on the Loan, and USACM (on behalf of the direct lenders for that Loan) agreed to waive repayment of $797,175.62 in principal,

$677,860.24 in unrecovered interest, and $5,120,000.00 in an unrecovered exit fee payable to USACM.  All the Lerin Hills direct lenders approved the settlement payoff, and Judge Riegle approved the settlement payoff by order dated December 12, 2006.  USACM notified Compass of the order approving the settlement payoff.

117.    Notwithstanding Judge Riegle's order authorizing USACM to settle the Lerin Hills Loan, no settlement payment was ever received in connection with that Loan.  Instead, Compass subsequently refused to accept the Lerin Hills borrower's attempts to make the agreed settlement payment in full satisfaction of its obligations under the Lerin Hills Loan.  Compass demanded that the Lerin Hills borrower make a payoff for all sums due and owing on the Lerin Hills Loan in the total amount of $17,306,947.38, which included late fees, default interest, and the $5.12 million exit fee payable to Compass that USACM had previously agreed to waive.  Compass specifically told the Lerin Hills borrower that it did not care about Judge Riegle's order approving the settlement payoff or if the Lerin Hills project "burned" because Compass did not purchase USACM's loan servicing rights for charity but to make money.  Compass also recognized that the Lerin Hills borrower's failure to acquiesce to its demand to pay an exit fee would result in the Lerin Hills direct lenders losing their money.

118.    When the Lerin Hills borrower refused to accede to Compass' settlement payoff demands, Compass moved to foreclose on the Lerin Hills Loan.  Although Compass subsequently withdrew its notice of foreclosure, the damage had already been done.  Specifically, as Compass was aware, the Lerin Hills Loan was a second lien subordinate to a first lien and an intercreditor agreement with Wachovia Bank.  By initiating foreclosure proceedings while the first lien was still outstanding, Compass triggered Wachovia's right to accelerate its own loan and foreclose on the property.  Wachovia then sold its first lien rights to another party, which pursued its foreclosure rights, eliminating all the direct lenders' equity in the property as second lienholders and resulting in a total loss to the Lerin Hills direct lenders.

### 3. Defendants engaged in loan servicing misconduct in connection with the "Bay Pompano" Loan.

119.    In June 2005, USACM originated a $32 million loan to Bay Pompano Beach, LLC. On April 3, 2007, the Bay Pompano borrower made a written settlement proposal to Compass, stating that it would pay the full remaining principal balance, all outstanding accrued ordinary interest, and an exit fee in the amount of $320,000, but not default interest or late fees.  Compass, however, did not notify the Bay Pompano direct lenders of that settlement proposal.

120.    By certified letter dated April 13, 2007, a Bay Pompano direct lender, on behalf of at least 51% of the direct lenders in that Loan, requested that Compass accept the borrower's settlement proposal of April 3, 2007.  Compass did not respond to that letter.  Instead, by letter dated April 25, 2007, counsel for Compass wrote the Bay Pompano borrower, advising that the amount then due and owing included (i) the principal balance of $14,682,911.51, (ii) ordinary and default interest totaling $2,621,593.40, (iii) late fees totaling $877,526.24, and (iv) exit fees totaling $320,000.00; and demanding that the borrower immediately assign to Compass all rents, income, and profits generated by the collateralized property.

121.    A loan status report for the Bay Pompano Loan, dated June 8, 2007, indicated that, on May 17, 2007, the Bay Pompano borrower purportedly made a settlement offer of $15,689,122.00, and Compass would be requesting that the Bay Pompano direct lenders accept a discounted payoff resulting in them receiving approximately 90% of the principal balance and waiving accrued interest. Thus, according to that loan status report, Compass purportedly would propose that the Bay Pompano direct lenders accept the Bay Pompano borrower's settlement offer if Compass could retain more than $2 million in fees and default interest.  Compass, however, never conveyed the borrower's settlement offer to the Bay Pompano direct lenders.  Instead, without the consent of the Bay Pompano direct lenders, Compass chose to foreclose on the Bay Pompano Loan because the Bay Pompano borrower purportedly "was not willing to make a full repayment of the loan which left

Compass with no choice but to foreclose."   As a result of Compass's wrongful foreclosure action against the Bay Pompano borrower, the direct lenders were damaged.

    **4.**      **Defendants engaged in loan servicing misconduct in connection with the "Fox Hills" and "Eagle Meadows" Loans.**

122.    In October 2005 and January 2006, USACM originated loans to Fox Hills 216, LLC and Eagle Meadows Development, respectively, in the total principal amount of between $57 and $58 million.  The Fox Hills and Eagle Meadows Loans were made in connection with the same real estate development project in Los Banos, California, and to borrowers having the same principal.

123.    The total amount of principal and accrued interest due and owing on the Fox Hills and Eagle Meadows Loans was $58 million as of November 2006, and $62.3 million as of March 2007.  A lien in the amount of $3.3 million against certain property that was paid by Compass increased the total amount due and owing on the Fox Hills and Eagle Meadows Loans to $65.6 million.

124.    In late December 2006, the principal of the Fox Hills and Eagle Meadows borrowers met with Compass representatives, including Piskun, regarding the two Loans.  At that meeting, Compass stated that it was "now in control of the Loans and that all decisions would be made by them and no one else and therefore [the principal of the Fox Hills and Eagle Meadows borrowers] was to talk solely with them about the resolution of the Loans."  Compass also invited the principal of the Fox Hills and Eagle Meadows borrowers to submit a settlement proposal to pay off the two Loans.

125.    Pursuant to Compass' invitation, the principal of the Fox Hills and Eagle Meadows borrowers subsequently made four settlement payoff proposals to Compass.  The final payoff proposal to Compass was for $65 million, which the principal of the Fox Hills and Eagle Meadows borrowers believed to be an amount sufficient to pay off the principal balance and all accrued interest on the two Loans.

126.     Although the principal of the Fox Hills and Eagle Meadows borrowers repeatedly asked Compass for its calculation of the total amount of principal and accrued interest due and owing on the two Loans, Compass neither provided him with its breakdown of the total amount due and owing on the Loans, nor responded to any of his four loan settlement payoff proposals.

127.     Instead, on or about March 5, 2007, Compass provided the principal of the Fox Hills and Eagle Meadows borrowers with a settlement payoff proposal for the two Loans in the total amount of more than $70 million.  Despite the request of the principal of the Fox Hills and Eagle Meadows borrowers, Compass never provided him with a breakdown of the $70 million figure, including how much of the proposed settlement payoff comprised default interest and late charges.

128.     Upon learning of the $65 million settlement payoff proposal made by the principal of the Fox Hills and Eagle Meadows borrowers, approximately 75% of the Fox Hills and Eagle Meadows direct lenders sent a written demand to Compass to accept the $65 million settlement payoff proposal.

129.     Notwithstanding that directive by more than 51% of the Fox Hills and Eagle Meadows direct lenders, Compass refused to accept the $65 million settlement payoff proposal because that proposal was purportedly $9 million too low to repay the full principal balance of the Fox Hills and Eagle Meadows Loans.  In other words, Compass refused to accept the settlement payoff proposal because it did not include default interest, late charges, and other fees to which Compass wrongly claimed to be entitled.  Compass acknowledged as much to one of the Fox Hills and Eagle Meadows direct lenders, and also confirmed that it was "unwilling to compromise."

130.     Compass's actions caused substantial damages to the Fox Hills and Eagle Meadows direct lenders.

**5.     Defendants engaged in loan servicing misconduct in connection with the "Harbor Georgetown" Loan.**

131.    In August 2004, USACM originated a loan in the amount of $8,800,000 to Harbor Georgetown, L.L.C.

132.    In or about March 2008, the Harbor Georgetown direct lenders instructed Compass to accept on their behalf the Harbor Georgetown borrower's proposed settlement payoff in the amount of $7,750,000 in full satisfaction of the Harbor Georgetown Loan.

133.    Compass wrongfully refused to accept that proposed settlement payoff on behalf of the Harbor Georgetown direct lenders because one direct lender refused to consent to the proposed settlement payoff and Compass maintained that 100% approval was required for it to accept the proposed payoff.

134.    As a result of Compass's failure to accept that proposed settlement payoff, the Harbor Georgetown direct lenders subsequently lost approximately $5.2 million when the Harbor Georgetown Loan was sold on April 9, 2010, to a third party for $2,517,569.17.

**6.     Defendants engaged in loan servicing misconduct in connection with the "Castaic" Loans.**

135.    In September 2004, July 2005, and September 2005, USACM originated three related Loans to Castaic Partners, LLC, Castaic Partners II, LLC, and Castaic Partners III, LLC (collectively, "Castaic") in the total amount (including additional borrowings) of more than $32 million.  The three Castaic Loans were personally guaranteed by William Barkett ("Barkett").

136.    In January 2010, Castaic and Barkett sued the Castaic direct lenders, as well as Compass and Silar, for damages caused by Compass, Silar, and Asset Resolution, as agents for the Castaic direct lenders, in connection with the Castaic Loans (the "Castaic Lawsuit").  Castaic and Barkett also sought a declaration that the Castaic Loans and the Barkett personal guarantees are unenforceable.

137.    As a result of the Castaic Lawsuit, the Castaic direct lenders have had to retain legal counsel to pursue and defend their property rights and interests.

138.    The Castaic direct lenders are entitled to reimbursement and/or indemnification for their legal fees and costs incurred in connection with the Castaic Lawsuit, as well as for any damages for which they are held liable in the Castaic Lawsuit as a result of any unauthorized actions taken by Compass, Silar, and Asset Resolution.

139.    The Castaic direct lenders are also entitled to damages for any losses resulting from the declaratory relief being sought by Castaic and Barkett in the Castaic Lawsuit.

**7.    Defendants engaged in loan servicing misconduct in connection with the wrongful foreclosure of the four "Suttles Loans."**

140.    Without the authorization of at least 51% of the direct lenders, Compass wrongfully pursued foreclosure proceedings in connection with the four Loans made to entities controlled by Tracy D. Suttles, namely, the Anchor B, Gess, Gramercy, and Shamrock Loans.   Compass wrongfully pursued those unauthorized foreclosure actions so it could obtain title to, and realize a substantial return from a pre-arranged sale to a third party of, the valuable Shamrock property.

141.    As a result of those unauthorized foreclosure actions, the Suttles Loans direct lenders were required to pay $1.1 million to settle Suttles's wrongful foreclosure claims.

**8.    Defendants engaged in loan servicing misconduct in connection with other Loans.**

142.    Compass misapplied principal payments made by the "Palm Harbor" and "The Gardens" borrowers to fees allegedly due to Compass as the loan servicer.   By those actions, Compass put those Loans into default, causing the Palm Harbor and The Gardens direct lenders to lose substantial sums to which they were entitled.

143.    Compass retained Citron to be its Florida subservicer with respect to the "Lake Helen Partners" Loan.   Compass, Silar, and Asset Resolution were responsible for all actions taken or not taken by Citron under the LSAs.   In April 2009, after acquiring title to the Lake Helen Partners

property upon the completion of foreclosure proceedings, Citron, without the authorization to do so, sold approximately 7.6 acres of the property for $200,000.  The Lake Helen Partners direct lenders have not been paid their fractional share of those sale proceeds.  Citron has disbursed its assets, including the $200,000 payment, to the Citron Defendants.

144.     In furtherance of their efforts to collect loan servicing compensation in priority to, and to the financial detriment of, the direct lenders, Compass, Silar, and Asset Resolution also caused damages, including the destruction of the value of the collateral securing the Loans, to Plaintiffs by their actions or omissions in connection with at least the following Loans (in addition to all those Loans specifically discussed previously):  "60th Street Venture," "Amesbury," "BarUSA," "Binford Medical," "Brookmere," the "Bundy" Loans, "Cabernet Highlands," "Charlevoix," "Clear Creek Plantation," "Collwood," "Comvest," "Cornman Toltec," "Del Valle Livingston," "Hesperia," "HFA Clearlake I," "HFA Clearlake II," "Huntsville," "Margarita Annex," "Marlton Square I," "Marlton Square II," "Mountain House," "Oak Shores II," "Ocean Atlantic $2.75MM," "Ocean Atlantic $9.425MM," "SoCal Land Development," and "Ten-Ninety."

**D.     The Damage Done**

145.     Plaintiffs lost substantial sums as a result of Defendants' wrongful loan servicing enterprise and additional loan servicing misconduct.  Pursuant to Defendants' loan servicing enterprise, Plaintiffs sold their fractional beneficial interests in various Loans at substantial discounts, and were not paid considerable proceeds from the Loans that were wrongfully taken by Defendants as purported loan servicing compensation to which they were not entitled.  Pursuant to Defendants' additional loan servicing misconduct, Plaintiffs lost favorable resolutions of the Loans, incurred substantial liabilities in connection with the Loans, and are left with fractional beneficial interests in Loans that are of marginal, if any, value.

**E.**     **Class Allegations**

146.     Plaintiffs bring this action against Defendants on behalf of themselves and all other similarly situated direct lenders represented by Bickel & Brewer who invested in the Loans in which Defendants perpetrated the loan servicing misconduct alleged herein.

147.     This action has been brought, and may properly be maintained, as a class action because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

148.     Numerosity:  The number of the other similarly situated direct lenders represented by Bickel & Brewer who want to be included in this action could be as many as an additional 1,000 persons.   The persons in the class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

149.     Common Questions Predominate:  This action involves common questions of law and fact to the potential class because each class member's claim derives from the same loan servicing misconduct perpetrated by Defendants in connection with each of the particular Loans alleged herein.  The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts with respect to a particular Loan will establish the right of each member of the class to recover as to that Loan.  Among the questions of law and fact common to the class are:

a)     Whether Defendants breached various duties that they owed to the direct lenders in connection with the Loans;

b)     Whether Defendants conspired to engage in the loan servicing misconduct alleged herein;

c)     Whether Defendants engaged in a RICO association and engaged in a pattern of activity designed to defraud Plaintiffs and the class;

d)      Whether Defendants engaged in a "Nevada RICO" association and engaged in crimes related to racketeering designed to defraud Plaintiffs and the class;

e)      Whether Plaintiffs and the class are entitled to declaratory and other equitable relief; and

f)      Whether Plaintiffs and the class are entitled to recover compensatory, consequential, treble, and/or punitive damages, plus interest and attorneys' fees.

150.    Typicality:  Plaintiffs' claims are typical of the class because Plaintiffs entered into the same LSAs, and invested in the same Loans, as did the members of the class.  Thus, Plaintiffs and the members of the class sustained the same injuries and damages arising out of Defendants' loan servicing misconduct.

151.    Adequacy:  Plaintiffs will fairly and adequately protect the interests of all members of the class because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the loan servicing misconduct of which they complain.  Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of the members of the class.  Plaintiffs have retained highly competent and experienced attorneys to represent their interests and that of the class.  No conflict of interest exists between Plaintiffs and the members of the class because all questions of law and fact regarding the liability of Defendants are common to the members of the class and predominate over any individual issues that may exist, such that by prevailing on their own claims, Plaintiffs necessarily will establish Defendants' liability as to the members of the class.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the members of the class and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the members of the class.

152.    Superiority:   There is no plain, speedy, or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the class

will tend to establish inconsistent standards of conduct for Defendants, result in the impairment of the rights of the members of the class, and dispose of the interests of the members of the class through actions to which they were not parties.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender.  Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

153.    Nexus to Nevada:  The State of Nevada has a special interest in regulating the affairs of corporations that do business here.  Defendants were required to comply with Nevada law because the LSAs and the Loans were expressly governed by Nevada law, they were "mortgage brokers" within the meaning of Nevada law, and the Preliminary Injunction entered by the District Court in the 892 Case required them to employ a Nevada-licensed subservicer.  In addition, the Bankruptcy Cases are pending in the District of Nevada.  Accordingly, a substantial nexus exists between Defendants' unlawful behavior and Nevada such that the Nevada courts should take cognizance of this action on behalf of a class of all other similarly situated direct lenders represented by Bickel & Brewer.

154.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## V.

## CAUSES OF ACTION

**A.    Violations Of The Racketeer Influenced And Corrupt Organizations Act ("RICO") Against All Defendants**

155.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

156.    Each of Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

**1.    The enterprise.**

157.    Compass and Silar engaged in their wrongful loan servicing enterprise in violation of RICO beginning in March 2007.  Plaintiffs did not discover that enterprise until in and after March 2007.  Specifically, although Compass was the successful bidder for the Purchased Assets on December 7, 2006, Compass did not close on its acquisition of the Purchased Assets until February 16, 2007, and, therefore, Compass and Silar did not formally begin to service the Loans until on and after that date.  Leeds and Mezei were in control of each and every aspect of the loan servicing enterprise, and were assisted by each of the other Defendants.  Defendants are separate and distinct from the loan servicing enterprise.  Thus, Defendants acted as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that affects interstate commerce.

**2.    Compass and Silar engaged in a pattern of racketeering activity.**

158.    Compass and Silar engaged in a pattern of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by committing mail fraud (in violation of 18 U.S.C. § 1341) and wire fraud (in violation of 18 U.S.C. § 1343) in connection with their servicing of the Loans.  Compass's and Silar's racketeering activity constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because they acted with continuity and pursuant to a scheme, with the intention to defraud and avoid lawful obligations to the direct lenders, with the reasonable foreseeability that the mail and wires would be used, and actually used the mail and wires to further the scheme.

159.    In particular, Compass and Silar engaged in a scheme to defraud the direct lenders. The purpose of their scheme was to enrich themselves by acquiring fractional beneficial interests at substantial discounts, and by retaining funds obtained in connection with the Loans to which they were not entitled, all to the financial detriment of the direct lenders.

160.    Defendants regularly communicated with each other through personal meetings, written correspondence, facsimile transmissions, and telephone conferences.  To facilitate those

communications, Defendants utilized interstate wires, the United States Postal Service, and interstate carriers.

161.     Compass's and Silar's fraudulent scheme with respect to the direct lenders was perpetrated through the use of the mail and interstate wires, in violation of 18 U.S.C. §§ 1341 and 1343.   For the purpose of executing their fraudulent scheme, Compass and Silar and their subordinates have committed two or more predicate acts that were related, continuous, and ongoing. In particular, Defendants used the United States mail and interstate wires for telephone calls, facsimile transmissions, and other electronic correspondence to defraud and mislead the direct lenders in connection with their unlawful scheme related to the servicing of the Loans.   In connection with their scheme to avoid their lawful obligations to the direct lenders, Defendants made a number of known and material misrepresentations, and omitted to disclose material information, to Plaintiffs.

162.     In addition, Defendants' racketeering activity constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because their use of the mail and interstate wires to defraud the direct lenders was repeated multiple times.

163.     In violation of 18 U.S.C. § 1962(b), Compass and Silar, through the above pattern of racketeering activity, acquired and maintained control over the loan servicing enterprise, which engaged in interstate commerce.   Their control over the loan servicing enterprise allowed them to use, operate, and transfer assets obtained in connection with the Loans to the financial detriment of Plaintiffs in violation of 18 U.S.C. § 1962(b).

164.     In violation of 18 U.S.C. § 1962(c), Leeds, Mezei, Cohen, Piskun, Blatt, Friedman, Gracin, Tai, Windemere, Oakbridge, Citron, the Citron Defendants, SOS, Reiner, Lomazow, Repotex, and EGG, who were employed by or associated with the loan servicing enterprise, have participated in and conducted the affairs of the loan servicing enterprise through the pattern of

racketeering activity described above.   The loan servicing enterprise, although controlled by Defendants, is separate and distinct from Defendants.

165.   In addition, Defendants have joined together to defraud the direct lenders and agreed to commit the unlawful acts as part of the pattern of racketeering activity described above. Defendants' activities, as demonstrated by the facts set forth above, establish Defendants' agreement to knowingly participate in a collective venture toward a common goal, and thereby establish a conspiracy to commit mail fraud and wire fraud for the purpose of unlawfully defrauding Plaintiffs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).  Defendants' activities, therefore, violate 18 U.S.C.§ 1962(d), which prohibits a conspiracy to violate 18 U.S.C. § 1962(c).

### 3.   **Plaintiffs' damages.**

166.   As stated above, Defendants have engaged in a pattern of racketeering activity in connection with the Loans in violation of 18 U.S.C. § 1962.

167.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962, Plaintiffs have suffered and continue to suffer injuries to their property, including their interests in the Loans.

168.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their actual damages, the costs of this action, and their reasonable attorneys' fees.

### B.   **Violations Of Nevada's Anti-Racketeering Law ("Nevada RICO") Against All Defendants**

169.   Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

### 1.   **The enterprise.**

170.   Compass and Silar engaged in their wrongful loan servicing enterprise in violation of Nevada RICO beginning in March 2007.  Plaintiffs did not discover that enterprise until in and after March 2007.  Specifically, although Compass was the successful bidder for the Purchased Assets on

December 7, 2006, Compass did not close on its acquisition of the Purchased Assets until February 16, 2007, and, therefore, Compass and Silar did not formally begin to service the Loans until on and after that date.  Leeds and Mezei were in control of each and every aspect of the loan servicing enterprise, and were assisted by each of the other Defendants.  Defendants are separate and distinct from the loan servicing enterprise.  Thus, Defendants acted as an "enterprise" within the meaning of NEV. REV. STAT. § 207.380.

**2.   Defendants engaged in at least two crimes related to racketeering.**

171.   Defendants have engaged in at least two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents, within the meaning of NEV. REV. STAT. § 207.390.

172.   Pursuant to NEV. REV. STAT. § 207.360, a "crime related to racketeering" includes the commission of, attempt to commit, or conspiracy to commit "[t]aking property from another under circumstances not amounting to robbery," "[e]mbezzlement of money or property valued at $250 or more," or "[o]btaining possession of money or property valued at $250 or more . . . by means of false pretenses."  An embezzlement occurs under NEV. REV. STAT. § 205.300 when any person to whom money or property has been entrusted uses or appropriates the money or property in any manner or for any purpose other than that for which it was entrusted to the person.  A person obtains possession of money or property by false pretenses when he/she has an intent to defraud, makes a false representation, induces reliance on that representation, and defrauds the victim.

173.   In particular, Compass and Silar engaged in a scheme to defraud the direct lenders. The purpose of their scheme was to enrich themselves by acquiring fractional beneficial interests at substantial discounts, and by retaining funds obtained in connection with the Loans to which they were not entitled, all to the financial detriment of the direct lenders.

174.    In violation of NEV. REV. STAT. § 207.400(1)(b), Compass and Silar, through the above crimes related to racketeering, acquired and maintained control over the loan servicing enterprise in connection with the Loans.  Their control over the loan servicing enterprise has allowed them to use, operate, and transfer assets obtained in connection with the Loans to the financial detriment of Plaintiffs.

175.    In violation of NEV. REV. STAT. § 207.400(1)(c), Leeds, Mezei, Cohen, Piskun, Blatt, Friedman, Gracin, Tai, Windemere, Oakbridge, Citron, the Citron Defendants, SOS, Reiner, Lomazow, Repotex, and EGG, who were employed by or associated with the loan servicing enterprise, have participated in and conducted the affairs of the loan servicing enterprise through the racketeering activity described above.  The loan servicing enterprise, although controlled by Defendants, is separate and distinct from Defendants.

176.    In addition, Defendants have joined together to defraud the direct lenders and agreed to commit the racketeering activity described above.  Defendants' activities, as demonstrated by the facts set forth above, establish Defendants' agreement to knowingly participate in a collective venture toward a common goal, and thereby establish a conspiracy to commit the racketeering activity described above within the meaning of NEV. REV. STAT. §§ 207.400(1)(b),(c).  Defendants' activities, therefore, violate NEV. REV. STAT. § 207.400(1)(j), which prohibits a conspiracy to violate NEV. REV. STAT. §§ 207.400(1)(b),(c).

### 3.    Plaintiffs' damages.

177.    As stated above, Defendants have engaged in at least two crimes related to racketeering activity in connection with the Loans in violation of NEV. REV. STAT. § 207.400(1).

178.    As a direct and proximate result of Defendants' violations of NEV. REV. STAT. § 207.400(1), Plaintiffs have suffered and continue to suffer injuries to their property, including their interests in the Loans.

179.     Pursuant to NEV. REV. STAT. § 207.400(1), Plaintiffs are entitled to recover threefold their actual damages, the costs of this action, and their reasonable attorneys' fees incurred in the trial and appellate courts.

**C.     Elder Abuse Against All Defendants**

180.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

181.     Pursuant to NEV. REV. STAT. §§ 41.1395(1),(4), Defendants are liable to those Plaintiffs over 60 years old that suffered a loss of money or property, caused by Defendants' use of those Plaintiffs' purported powers of attorney, to service the Loans to convert those Plaintiffs' money, assets, or property with the intention of permanently depriving those Plaintiffs of the ownership, use, benefit, or possession of such money, assets, or property.  Defendants' liability is for two times the actual damages incurred by those Plaintiffs over 60 years old.

182.     Pursuant to NEV. REV. STAT. § 41.1395(2), because they acted with recklessness, oppression, fraud, or malice, Defendants are also liable to those Plaintiffs over 60 years old for their attorneys' fees and costs.

**D.     Breach Of Contract Against Compass And Silar**

183.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

184.     Plaintiffs performed all their obligations under the LSAs, and all conditions precedent to the performance of Compass and Silar (and Asset Resolution) under the LSAs were performed and/or occurred.

185.     Compass and Silar (and Asset Resolution) materially breached their obligations under the LSAs by engaging in extensive loan servicing misconduct while lacking valid requisite powers of attorney to act on behalf of the direct lenders.

186.     As Compass was Silar's loan servicing agent under the LSAs pursuant to the MRA and various related instruments, Silar is vicariously liable for Compass's breaches of the LSAs.

187.    As Silar assigned the MRA and various related instruments to Asset Resolution, and because Asset Resolution assumed all Compass's rights and obligations under the LSAs, Asset Resolution is liable for its own, as well as Compass's, breaches of the LSAs.  And as Silar assigned its rights and obligations in the Purchased Assets to Asset Resolution while the 892 Case was pending, Silar is liable for Asset Resolution's breaches.

188.    As a result of the breaches by Compass and Silar (and Asset Resolution), Plaintiffs have been damaged in accordance with their fractional beneficial interests in the Loans in an amount to be determined at trial.

**E.    Breach Of The Implied Covenant Of Good Faith And Fair Dealing Against Compass, Silar, And Their Principals**

189.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

190.    Under Nevada law, Compass and Silar (and Asset Resolution) owed Plaintiffs an implied duty of good faith and fair dealing under the LSAs.

191.    Compass and Silar (and Asset Resolution) materially breached their implied duty of good faith and fair dealing under the LSAs by engaging in extensive loan servicing misconduct while lacking valid requisite powers of attorney to act on behalf of the direct lenders.

192.    As Compass was Silar's loan servicing agent under the LSAs pursuant to the MRA and various related instruments, Silar is vicariously liable for Compass's breaches of its implied duty of good faith and fair dealing under the LSAs.

193.    As Silar assigned the MRA and various related instruments to Asset Resolution, and because Asset Resolution assumed all Compass's rights and obligations under the LSAs, Asset Resolution is liable for its own, as well as Compass's, breaches of their implied duty of good faith and fair dealing under the LSAs.  And as Silar assigned its rights and obligations in the Purchased Assets to Asset Resolution while the 892 Case was pending, Silar is liable for Asset Resolution's breaches.

194.    In addition, because Compass and Silar (and Asset Resolution) had a fiduciary relationship with the direct lenders when handling funds on account of the direct lenders, they also tortiously breached the implied covenant of good faith and fair dealing in the LSAs by engaging in grievous and perfidious misconduct.   Pursuant to that duty, Compass and Silar (and Asset Resolution) could not elevate their interests above the interests of the direct lenders for whom they were servicing the Loans pursuant to the LSAs.   For example, Compass and Silar (and Asset Resolution) could not seek to retain default interest and late charges as loan servicing compensation from collected funds in derogation of the right of the direct lenders to be repaid first their principal and all accrued regular interest due and owing under the Loans.

195.    The principals of Compass and Silar (and Asset Resolution) are also personally liable for such tortious actions.

196.    As a result of the breaches by Compass and Silar (and Asset Resolution), Plaintiffs have been damaged in accordance with their fractional beneficial interests in the Loans in an amount to be determined at trial.

**F.    Breach Of Fiduciary Duty Against Compass, Silar, And Their Principals**

197.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

198.    Compass and Silar (and Asset Resolution) owed fiduciary duties to Plaintiffs when handling any monies they collected on the Loans on behalf of the direct lenders.

199.    Compass and Silar (and Asset Resolution) breached their fiduciary duties to Plaintiffs by wrongfully taking and receiving funds as purported loan servicing compensation to which they were not entitled, and by not properly accounting for funds received in connection with the Loans.

200.    As Compass was Silar's loan servicing agent under the LSAs pursuant to the MRA and various related instruments, Silar is vicariously liable for Compass's breaches of fiduciary duties.

201.    As Silar assigned the MRA and various related instruments to Asset Resolution, and because Asset Resolution assumed all Compass's rights and obligations under the LSAs, Asset Resolution is liable for its own, as well as Compass's, breaches of fiduciary duties.  And as Silar assigned its rights and obligations in the Purchased Assets to Asset Resolution while the 892 Case was pending, Silar is liable for Asset Resolution's breaches.

202.    The principals of Compass and Silar (and Asset Resolution) are also personally liable for such tortious actions.

203.    As a result of the breaches by Compass and Silar (and Asset Resolution), Plaintiffs have been damaged in accordance with their fractional beneficial interests in the Loans in an amount to be determined at trial.

204.    As a result of Compass's and Silar's (and Asset Resolution's) actions, Plaintiffs are also entitled to an award of punitive damages in an amount to be determined at trial.

**G.     Conversion Against All Defendants**

205.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

206.    Defendants wrongfully and knowingly exerted dominion and control over funds obtained in connection with the Loans that were supposed to be paid to the direct lenders.

207.    Defendants' wrongful taking of such funds was inconsistent with, or in derogation, exclusion, or defiance of Plaintiffs' rights to possession of those funds.

208.    As a result of Defendants' conversion of those funds, Plaintiffs have suffered damages in accordance with their fractional beneficial interests in the Loans in an amount to be determined at trial.

209.    As a result of Defendants' actions, Plaintiffs are also entitled to an award of punitive damages in an amount to be determined at trial.

**H.     Civil Conspiracy Against All Defendants**

210.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

211.    Defendants acted in concert with the intention of unlawfully enriching themselves to the financial detriment of the direct lenders.

212.    As a result of Defendants' actions, Plaintiffs have been damaged in accordance with their fractional beneficial interests in the Loans in an amount to be determined at trial.

213.    As a result of Defendants' actions, Plaintiffs are also entitled to an award of punitive damages in an amount to be determined at trial.

**I.      Alter Ego Against Silar**

214.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

215.    Asset Resolution is wholly owned by Silar, had no employees, and was formed merely as a corporate shell to be, and that was, operated as a single economic entity by Silar, including specifically Leeds, Gracin, and Tai.

216.    SOS was an affiliate of Silar that was formed merely as a corporate shell to be, and that was, operated as a single economic entity by Silar, including specifically Leeds, Gracin, and Tai.

217.    Silar wrongfully and knowingly used Asset Resolution as a mere instrumentality or alter ego to effectuate an injustice on the direct lenders.  Silar improperly sought to use Asset Resolution as a shield against the direct lenders' damages claims while purporting to obtain all the benefits of ownership of the Purchased Assets.

218.    Silar wrongfully and knowingly used SOS as a mere instrumentality or alter ego to effectuate an injustice on the direct lenders.

219.    As a result of its elaborate shell game with Asset Resolution and SOS, Silar is liable to Plaintiffs for the loan servicing misconduct that it perpetrated by and through Asset Resolution and SOS.

220.    As a result of Silar's actions, Plaintiffs are entitled to an award of damages in an amount to be determined at trial.

**J.**     **Declaratory Judgment Against Compass And Silar**

221.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

222.    Defendants are collaterally estopped from challenging the prior rulings made by the District Court in the 892 Case in connection with the Loans, the LSAs, the 51% Rule, the loan servicing compensation to which the loan servicer under the LSAs is entitled, the loan servicers under the LSAs being "mortgage brokers" under Nevada law, the lack of requisite powers of attorney held by the loan servicers under the LSAs, the inability of the loan servicers under the LSAs to pursue damages claims against the direct lenders, and Silar's liability for Compass's loan servicing misconduct.

223.    Plaintiffs are entitled to a declaratory judgment that confirms that the declaratory relief recognized by the District Court in the 892 Case also applies to Plaintiffs herein, and that Defendants are collaterally estopped from challenging such declaratory relief.

**K.**     **Constructive Trust Against All Defendants**

224.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

225.    Defendants have wrongfully and inequitably taken and retained funds obtained in connection with the Loans to which they are not entitled.  Because it would be inequitable for Defendants to retain those funds, the imposition of a constructive trust related to those funds is essential to effectuate justice and to ensure the protection of Plaintiffs' rights in and to those funds.

**L.**     **Attorneys' Fees Against Compass And Silar**

226.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

227.    Pursuant to section 15 of the predominant "Type 4" LSAs, Plaintiffs are entitled to recover their costs, expenses, and attorneys' fees incurred in this action and on appeal for prevailing on their claims to enforce provisions of the LSAs.

# VI.

## DEMAND FOR JURY TRIAL

228.    Plaintiffs demand a jury trial on all issues so triable.

# VII.

## REQUEST FOR RELIEF

229.    In light of the foregoing, Plaintiffs respectfully request that the Court enter judgment for Plaintiffs and against Defendants, awarding Plaintiffs and all others similarly situated the following relief:

a.    A declaration confirming that the declaratory relief recognized by the District Court in the 892 Case also applies to Plaintiffs and all members of the class, and that Defendants are collaterally estopped from challenging such declaratory relief;

b.    Actual, compensatory, consequential, double, and treble damages in accordance with their fractional beneficial interests in the Loans in an amount to be determined at trial;

c.    Punitive damages in an amount to be determined at trial;

d.    Costs of Court;

e.    Reasonable attorneys' fees and costs incurred by Plaintiffs herein and on any appeal;

f.    Pre- and post-judgment interest at the highest lawful rates;

g.    The imposition of a constructive trust on funds improperly retained by Defendants to which they are not entitled; and

h.    Such other and further relief to which Plaintiffs and the members of the class may be entitled and which this Court deems just and proper.

Dated: March 21, 2011

BICKEL & BREWER

LAW OFFICE OF LISA RASMUSSEN, ESQ.

By:    _/s/ Lisa A. Rasmussen_
        _____
        LISA RASMUSSEN, ESQ.,

1

<u>**Exhibit A**</u>

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.      Leonard C. Adams

2.      Denise M. Adams

3.      Kenneth Addes

4.      Victoria Addes

5.      Michel F. Aiello

6.      Patricia A. Aiello

7.      Adib M. Al-Awa

8.      Ellen A. Al-Awar

9.      David J. Albiol

10.     Dr. Florence Alexander

11.     Dr. Stanley Alexander

12.     Donna L. Allgeier

13.     Robert L. Allgeier

14.     Karen R. Allison

15.     Barbara A. Altman

16.     Daniel C. Altman

17.     Steven C. Altman

18.     August J. Amaral

19.     Lynda Gay Anderson

20.     Robert P. Anderson

21.     Roberta J. Anderson

22.     Albert D. Andrade

23.     Donna Arbogast

24.     Rodney J. Arbogast

25.   Suzanne L. Arbogast

26.   Albert M. Arechiga

27.   Richard Armijo

28.   Edwin E. Arnold

29.   Allan Arthur

30.   Mary E. Asselin

31.   Robert J. Asselin

32.   Michael Au

33.   Cindy Avena

34.   Thomas Avena

35.   Loretta D. Backes

36.   Paul P. Backes

37.   Peter L. Backes

38.   Sigfried Baker

39.   Alterio Banks

40.   Don L. Barnes

41.   Miriam M. T. Barnes

42.   James W. Barnes

43.   Clark Baron

44.   Joyce Baron

45.   Clark R. Bartkowski

46.   Jean P. Bartkowski

47.   Gary R. Barton

48.   Mavis J. Barton

49.   Irene K. Bass

50. Joseph F. Bellesorte

51. Marjorie Y. Berlin

52. Donald M. Berman

53. Janice I. Berman

54. Jean J. Berthelot

55. William M. Bettencourt, Jr.

56. Joan Bettencourt

57. Jay Betz

58. Joy Betz

59. Anthony Bilotto

60. Gerald L. Bittner, Sr.

61. Susan I. Bittner

62. Karen G. Blachly

63. Carolyn N. Blackman

64. Jerry L. Blackman, Sr.

65. Darrel L. Blanck

66. Yvonee M. Blanck

67. Michael S. Blau

68. Shamiran Blau

69. Charma N. Block

70. Jerome L. Block

71. Judy A. Blood

72. Russell M. Blood

73. Cynthia Reed Boegel

74. Dennis W. Boegel

75.     Betty Boese

76.     John S. Borkoski

77.     Kathleen K. Borkoski

78.     Charles E. Borom

79.     Lanna G. Borom

80.     Richard A. Bradbury

81.     Sarah S. Bradbury

82.     Ann L. Brant

83.     Raymond F. Brant

84.     Michael Braunstein

85.     Glen J. Brecht

86.     Janet Brecht

87.     Janine K. Brecht

88.     Marshall J. Brecht

89.     Donald W. Brehm

90.     Hannah Brehmer

91.     Marilyn Brenner

92.     Michael Brenner

93.     Michael T. Bridges

94.     Cindy G. Brines

95.     Michael R. Brines

96.     Donald E. Briney

97.     Penny L. Brock

98.     Doreen C. Brooks

99.     Howard D. Brooks

100.   John P. Brouwers

101.   John W. Brouwers

102.   Robert A. Bryant, Sr.

103.   Bruce D. Bryen

104.   Eleanor Buck

105.   William E. Buck

106.   Nancy A. Buechner

107.   William R. Buechner

108.   Ed Burgess

109.   Alyce E. Cadwallader

110.   David S. Cadwallader

111.   Valerie Callahan

112.   Judith Candelario

113.   Donna M. Cangelosi

114.   Margaret M. Cangelosi

115.   William A. Carone

116.   Doyne J. Carson

117.   Elsie L. Carson

118.   Leslie A. Carter

119.   Ronald R. Carter

120.   Jairo A. Castillo

121.   Tito A. Castillo

122.   Mary Ann Catalanello

123.   Ralph F. Catalanello

124.   Jacqueline Cauchois

125.    Maurice Cauchois

126.    Barbara A. Cecil

127.    Robert J. Centanni

128.    Susan R. Centanni

129.    Leona M. Chapman

130.    Tony Chaudhry

131.    Paul G. Chelew

132.    Joann Chiappetta

133.    Pat Chiappetta

134.    John T. Chirgwin

135.    Barbara M. Chylak

136.    Robert T. Chylak

137.    Billie R. Cislaghi

138.    Curtis Clark

139.    Jack R. Clark

140.    Rosanne L. Clark

141.    Doreen S. Clendening

142.    John P. Clendening

143.    Dolores J. Climo

144.    James D. Climo

145.    George S. Cohan

146.    Natalie H. Cohan

147.    Nelson L. Cohen

148.    Margaret H. Cohn

149.    Peter C. Cohn

150. Larry Colborn

151. Loretta Colborn

152. Shirley M. Collins

153. Howard Connell

154. Lorene Connell

155. Daniel O. Conner

156. Harold Corcoran

157. Joyce Corcoran

158. Joseph L. Costello

159. Karen Cottrell

160. Kevon Cottrell

161. Frankye D. Craig

162. Howard L. Craig

163. Peter C. Cranston

164. Christine Craven

165. Lee Craven

166. Shirley Cupp-Doe

167. Fernando Cuza

168. Kristi Cuza

169. Denise M. Daniel

170. Leslie S. Daniel

171. Klint Thomas Danna

172. Frank Davenport

173. Chesley R. Davies

174. Mary E. Davies

175.    Martin A. Davis

176.    Virginia L. Davis

177.    Nancy R. Davis

178.    Patrick Davis

179.    Susan Davis

180.    Tracy A. Deberry

181.    Gary Deppe

182.    Peter Deluca

183.    Ann R. Dery

184.    James D. Dery

185.    Dwayne H. Deutscher

186.    Michelle T. Deutscher

187.    Anne F. Di Salvo

188.    Tamara Dias

189.    Marion B. Dittman

190.    Leah K. Dobyne

191.    Robert S. Dobyne

192.    Elizabeth Dokken-Baxter

193.    Michael Donahue

194.    Mieko Donovan

195.    Richard Donovan

196.    Loretta Donnolo

197.    Joseph Donnolo

198.    D. Joseph Doucet

199.    Louise M. Doucet

200. David B. Doutt, Sr.

201. Johnine M. Doutt

202. William A. Downey

203. Jill M. Doyle

204. Patrick J. Doyle

205. Daniel T. Drubin

206. Laura Drubin

207. Charles B. Dunn, IV

208. Ford S. Dunton

209. Penny Dupin

210. William Dupin

211. Jack L. Dysart

212. Monica C. Ebaugh

213. Karen Eberlin

214. Raymond J. Eberlin

215. Robert Roy Ecker

216. Carol A. Eller

217. Jonathan M. Eller

218. Richard L. English

219. Dr. David R. Enrico

220. Dr. Bonny K. Enrico

221. Dolores Y. Erickson

222. William F. Errington

223. Cindy Essaff

224. Robert Essaff

225.   Melinda Estevez

226.   Richard D. Estevez

227.   James F. Eves

228.   Denise F. Fager

229.   Byrne E. Falke, Sr.

230.   Bruce Falkenborg

231.   Marguerite Falkenborg

232.   Brenda Falvai-Powers

233.   Emily T. Farrah

234.   Joseph A. Farrah

235.   Carol M. Favro

236.   William H. Favro

237.   Christopher J. Fernandes

238.   Dionisio A. Fernandes

239.   Fiola F. Fernandes

240.   Jason D. Fernandes

241.   Melissa A. Fernandes

242.   Larry Fernandez

243.   Arlene J. Fine

244.   Lewis H. Fine

245.   Karen B. Finkel

246.   Ronald G. Finkel

247.   Richard T. Fiory

248.   M. Evelyn Fisher

249.   Timothy Folendorf

250.   Fred J. Foxcroft

251.   Roberta Foxcroft

252.   John V. Fragola

253.   Edward C. Fraser

254.   John R. Frederickson

255.   Barbara Frey

256.   Donald Frey

257.   Alan B. Friedman

258.   Robert Fuller

259.   Theodore J. Fuller

260.   Joan L. Fuller

261.   Glenn W. Gaboury

262.   Sharon M. Gaboury

263.   Darlene C. Gage

264.   Jerry L. Gage

265.   Paul L. Garcell

266.   Alex G. Gassiot

267.   Edmund G. Gaylord

268.   Aylene Geringer

269.   Marvin W. Gittelman

270.   Toby E. Gittelman

271.   Gale Gladstone-Katz

272.   Alicia Goffstein

273.   Robert Goffstein

274.   Nancy Golden

275. Jack Goldenthal

276. Sylvia Goldenthal

277. Barry J. Goldstein

278. Patricia B. Goldstein

279. Martin Gonska

280. James Paul Goode

281. Michael J. Goodwin

282. Paul D. Graf

283. Margaret A. Graf

284. Betty Grant

285. Gail A. Gray

286. Robert W. Gray

287. Eunice A. Greene

288. Nelson R. Greene

289. Clarence J. Greenwald

290. Gertrude R. Greenwald

291. Carter L. Grenz

292. Alan Groh

293. Wynn A. Gunderson

294. Lorraine J. Gunderson

295. Toby A. Gunning

296. Barbara L. Gunther

297. Joanne Halvorson

298. Suzanne M. Halvorson

299. Thomas L. Halvorson

300.   Darlene Hammond

301.   Kris J. Hamper

302.   Gloria W. Handelman

303.   William L. Hane

304.   Stan A. Hanes

305.   Donna J. Hansen

306.   Kenneth L. Hansen

307.   Gayle Harkins

308.   Dwight W. Harouff

309.   Mary Ann Harouff

310.   Beverly J. Harrington

311.   Suze Harrington

312.   Thomas T. Harrington

313.   Marguerite Harrison

314.   Thomas B. Harrison

315.   Marisa D. Harvey

316.   Jerome L. Harvey, Jr.

317.   Kevin J. Haselhorst

318.   John D. Hathcock

319.   Susan K. Hathcock

320.   Curtis Hattstrom

321.   Virginia Hattstrom

322.   Glenda G. Haynes

323.   Leo L. Haynes

324.   Roland Hearn

325.   Nadine Heaton

326.   Rose O. Hecker

327.   Barbara Heffner

328.   Mike Heffner

329.   Jocelyne Helzer

330.   Jay E. Henman

331.   Judith J. Hennen

332.   Virgil P. Hennen

333.   Allen Herd

334.   Marilyn Herd

335.   Allan R. Herndobler

336.   Sue Herndobler

337.   Brian K. Herndon

338.   Sharon L. Herndon

339.   Donald A. Herrmann

340.   Nancy E. Herrmann

341.   Judith A. Heyboer

342.   Philip Higerd

343.   Brenda J. High

344.   Edward O. High

345.   Hamilton M. High

346.   Marilyn Hilborn

347.   Robert W. Hill

348.   Jay P. Hingst

349.   Gail M. Hock

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

350.  John A. Hoglund

351.  Patricia O. Hoglund

352.  Nienke Hohmann

353.  Fred J. Holland

354.  Marjorie Holland

355.  Lisa M. Hollifield

356.  Angela J. Howard

357.  Earl Howsley, Jr.

358.  Todd Humphry

359.  Richard Ianni

360.  Yelana V. Ilchuk

361.  Stephen C. Irwin

362.  Evelyn Ives

363.  Jon P. Jensen

364.  Tamara L. Jensen

365.  Arthur V. Johnson

366.  Larry W. Johnson

367.  Marylin Johnson

368.  Richard A. Johnson

369.  Ronald A. Johnson

370.  Susan A. Johnson

371.  Diane E. Johnston

372.  Phyllis Johnston

373.  Rodney L. Johnston

374.  Deborah F. Josifko

375.   Mark R. Josifko

376.   Staci Kaiser

377.   Brigitte Kaneda

378.   Ken Kaneda

379.   Arthur E. Kebble

380.   Thelma M. Kebble

381.   John Keith

382.   Kathleen Keith

383.   Ana W. Kelley

384.   David G. Kelley

385.   Carol Kesler

386.   Lindsey Kesler, Jr.

387.   C. K. Khury

388.   Richard Kim

389.   Will Klaus

390.   Christine Klay

391.   Othmar Klay

392.   James T. Klega

393.   Shirley Klega

394.   Bernard Kloenne

395.   Christina Knoles

396.   Marcia J. Knox

397.   Colette Kopf

398.   Klaus Kopf

399.   Harvey A. Kornhaber

400.   Dorothea K. Kraft

401.   Al Kraus

402.   Katrina Kraus

403.   Colita Kwiatkowski

404.   Donald H. Kwiatkowski

405.   Paul Kwiatkowski

406.   Sandra L. Kwiatkowski

407.   Wendy Kwong

408.   Gerard Labossiere

409.   Lucille Labossiere

410.   Dina Ladd

411.   Catherine D. Lafayette

412.   Joseph B. Lafayette

413.   Gladys Lanzas

414.   Jose M. Lanzas

415.   Dolores Larson

416.   Gary Larson

417.   Ruth Ann Larson

418.   Sidney L. Larson

419.   Jon J. Lee

420.   Milton H. Lees, III

421.   Tracy Lee

422.   Carol Lefcourt

423.   James W. Lehr

424.   Julie Ann Lehr

425.   Kathleen F. Lehrmann

426.   Larry D. Lehrmann

427.   Carol Leiby

428.   Richard Leiby

429.   William H. Lenhart

430.   Jorg U. Lenk

431.   Irwin Levine

432.   Renee Levy

433.   Robert Levy

434.   James H. Lidster

435.   Phyllus M. Lidster

436.   Steve Lindquist

437.   Claire Lisek

438.   Daniel B. Lisek

439.   Nicholas Loader

440.   Ivan Loebs

441.   Boris M. Lokshin

442.   Mindy F. Lokshin

443.   William R. Long

444.   Richard J. Loughlin

445.   Roberta L. Loughlin

446.   Mary M. Lowe

447.   Robert L. Lowe

448.   Janice Lucas

449.   Mark Lurie

450.   Barbara Sue Luthi

451.   Richard D. Luthi

452.   Thomas D. Lynch

453.   Erika G. Lynn

454.   Heidi Machock

455.   Scott Machock

456.   Rogie Madlambayan

457.   Evan J. Madow

458.   Diane M. Maguire

459.   John J. Maguire

460.   Lou O. Maldonado

461.   John R. Mallin, Jr.

462.   Marie T. Mallin

463.   Guido Mandarino

464.   Gilbert Manuel

465.   Charles R. Maraden

466.   Alexander W. Marchuk

467.   Doreen W. Marchuk

468.   Alan M. Markus

469.   Trena L. Markus

470.   Don P. Marshall

471.   James T. Martin

472.   Jerrold T. Martin

473.   Gerald B. Marts

474.   Linda R. Marts

475.   Gladys Mathers

476.   Eddie Mayo

477.   Marti McAllister

478.   James M. McConnell

479.   Maudrene F. McConnell

480.   Michael T. McGrath

481.   James E. McKnight

482.   Gary McMahon

483.   Christina F. McShaffrey

484.   Harvey McShaffrey

485.   Bryan J. McWaters

486.   Lisa J. McWaters

487.   Marina Mehlman

488.   Joseph J. Melz

489.   Linda M. Melz

490.   Jack R. Mennis

491.   Susan A. Mennis

492.   Gerald B. Merz

493.   Nancy J. Merz

494.   Michael J. Messer

495.   Andre Michaelian

496.   Robert D. Mierau

497.   Sandra J. Mierau

498.   Barbara L. Miller

499.   Gary I. Miller

500.   George Minar

501.   Virginia Minar

502.   Albert J. Mineconzo

503.   Mae Mineo

504.   Michelle L. Mitchell

505.   Todd O. Mitchell

506.   Matthew Molitch

507.   Jeannie M. Monroe

508.   Wesley L. Monroe

509.   William L. Montgomery, Jr.

510.   Gene Montoya

511.   Arthur B. Moore

512.   Ernest J. Moore

513.   Patrick J. Moore

514.   William Richard Moreno

515.   Rosalie A. Morgan

516.   Nadine Morton

517.   Geoffrey Mott

518.   Frank J. Murphy

519.   James Murphy

520.   Margaret F. Murphy

521.   Tracy Murphy

522.   Kardakh Natto

523.   Kelly F. Neal

524.   Carmen Neidig

525.   Dan F. Nelson

526.   Teri Nelson

527.   Gary Nelson

528.   Linda Nelson

529.   Gloria J. Nelson

530.   James S. Nelson, IV

531.   Fred G. Neufeld

532.   Daniel Newman

533.   Freda Newman

534.   Elsie D. Newman

535.   Larry E. Newman

536.   Aleath Nicosia

537.   Benjamin Nicosia

538.   Richard A. Nielsen

539.   Allen M. Nirenstein

540.   Dorothy H. Nirenstein

541.   John Nix

542.   Lisa Nix

543.   Stanley M. Novara

544.   Joan Nunes

545.   Henry Obermuller

546.   Mengia Obermuller

547.   Cathleen B. O'Connor

548.   Robert H. O'Connor

549.   Robert L. Ogren

| | | |
|---|---|---|
| 1 | 550. | Betty R. Ogren |
| 2 | 551. | William W. Ogren |
| 3 | 552. | David M. Olds |
| 4 | 553. | Sally W. Olds |
| 5 | 554. | Kevin Olsen |
| 6 | 555. | Annie Omaye |
| 7 | 556. | Stanley Omaye |
| 8 | 557. | Adrian J.R. Oosthuizen |
| 9 | 558. | Catherine Oppio |
| 10 | 559. | John E. O'Riordan |
| 11 | 560. | Sonhild A. O'Riordan |
| 12 | 561. | Veslav Orvin |
| 13 | 562. | Aaron I. Osherow |
| 14 | 563. | Paul Oster |
| 15 | 564. | David A Palmer |
| 16 | 565. | Cynthia Ann Pardee |
| 17 | 566. | Betty R. Pardo |
| 18 | 567. | Lexey S. Parker |
| 19 | 568. | Henry E. Pattison |
| 20 | 569. | Ruth V. Pattison |
| 21 | 570. | Jennefer C. Peele |
| 22 | 571. | Bill Penn |
| 23 | 572. | Isa Penn |
| 24 | 573. | Lynn R. Perlman |
| 25 | 574. | Robert H. Perlman |

550. Betty R. Ogren

551. William W. Ogren

552. David M. Olds

553. Sally W. Olds

554. Kevin Olsen

555. Annie Omaye

556. Stanley Omaye

557. Adrian J.R. Oosthuizen

558. Catherine Oppio

559. John E. O'Riordan

560. Sonhild A. O'Riordan

561. Veslav Orvin

562. Aaron I. Osherow

563. Paul Oster

564. David A Palmer

565. Cynthia Ann Pardee

566. Betty R. Pardo

567. Lexey S. Parker

568. Henry E. Pattison

569. Ruth V. Pattison

570. Jennefer C. Peele

571. Bill Penn

572. Isa Penn

573. Lynn R. Perlman

574. Robert H. Perlman

575.   Andrew R. Peterson

576.   Sharon Peterson

577.   Robert D. Phillips

578.   Holly J. Pickerel

579.   Vickie Pieper

580.   Donald H. Pinsker

581.   Charles B. Plunkett

582.   Arthur Polacheck

583.   Glorianne Polacheck

584.   Martha W. Potter

585.   Hans J. Prakelt

586.   James C. Presswood

587.   Sharon E. Presswood

588.   Dennis Raggi

589.   John M. Randall

590.   Shirley A. Randall

591.   Benita M. Rashall

592.   Charles P. Rashall

593.   Linda K. Redfern

594.   Linda S. Reed

595.   Michael Reed

596.   Mary Ann Rees

597.   Noel E. Rees

598.   Linda C. Reid

599.   Michael H. Ricci

600.   Jean G. Richards

601.   Rachel Riehle

602.   Cassandra J. Robbins

603.   Donna R. Roberts

604.   Robert W. Roberts

605.   Alan Robinson

606.   Gail Robinson

607.   Robert R. Rodriguez

608.   Elisabeth Rogal

609.   Michael G. Rogal

610.   James W. Rogers

611.   Anita Rosenfield

612.   Arnold Rosenthal

613.   David Rosner

614.   Mary E. Russell

615.   Burton M. Sack

616.   Gregory V. Sak

617.   Jana L. Sak

618.   Murray Salit

619.   Randy M. Sanchez

620.   Sharon Sanchez

621.   Helena Sarmanian

622.   Peter Sarmanian

623.   Kenneth D. Sawyer

624.   Howard C. Sayler

625.   Phyllis L. Sayler

626.   Edward J. Scheidegger

627.   Janet E. Schnadt

628.   William E. Schnadt

629.   Kenneth Schulz

630.   Shirley E. Schwartz

631.   Ronald C. Shackelford

632.   Steven A. Shane

633.   Blanche Shapiro

634.   Ira Jay Shapiro

635.   Robert Shapiro

636.   James W. Shaw

637.   Evelyn Sheerin

638.   Joann Sheerin

639.   Sydney J. Siemens

640.   Leslie P. Siggs

641.   Robert G. Sikorski

642.   Alan Simon

643.   Carol Simon

644.   Alan R. Simmons

645.   Judith B. Simmons

646.   Bernard Sindler

647.   Tara Sindler

648.   Daryl B. Sisk

649.   Barbara Sklar

650.   Susan M. Slater

651.   Herbert Slovis

652.   Julie B. Slovis

653.   Bradford H. Smith

654.   Maggie Smith

655.   Joyce E. Smith

656.   Heidi Snow

657.   Jack Snow

658.   Angela S. Snyder

659.   Francesco Soro

660.   Barbara J. Speckert

661.   Robert S. Speckert

662.   Charles J. Spina

663.   Nancy H. Spina

664.   Clifton H. Spindle

665.   Verna R. Spindle

666.   Carol A. Squicci

667.   Arnold Stairman

668.   Rosalind L. Stark

669.   Jay S. Stein

670.   Cynthia M. Steinmetz

671.   Nicholas A. Steinmetz

672.   David G. Sterling

673.   Joseph Sterling

674.   Theresa Sterling

675.   Mary Jude

676.   Michael D. Stewart

677.   Gordon N. Stimpson

678.   Marjorie I. Stimpson

679.   George F. Stone

680.   Margaret A. Stone

681.   Denise Storch

682.   Ralph R. Storch

683.   Rand Sullivan

684.   Robert Sullivan

685.   Robert A. Susskind

686.   Leland K. Swanson

687.   Lena M. Swanson

688.   Donald Swezey

689.   Virginia Swilley

690.   Ray Syfert

691.   Carole Talan

692.   Cyril Tammadge

693.   Elizabeth Tarr

694.   Wayne P. Tarr

695.   Joyce L. Taylor

696.   Kerry S. Taylor

697.   Kevin Taylor

698.   Calvin Terrill

699.   Gary A. Thibault

700.   Sandra C. Thibault

701.   Bryan M. Thomas

702.   Lori M. Thomas

703.   Daryl D. Thompson

704.   Gregory R. Thompson

705.   Wilma Jean Thompson

706.   Norman Tiano

707.   Douglas Tichenor

708.   Susan Tichenor

709.   Dorothy Ton

710.   James G. Ton

711.   Richard Tracy

712.   Anton Trapman

713.   Irene Trapman

714.   Rory Triantos

715.   John M. Tripp

716.   Warren W. Tripp

717.   Carlos A. Trujillo

718.   Carol I. Turner

719.   Paul M. Turner

720.   Judy Turner

721.   Thomas R. Turner

722.   Nancy B. Ventura

723.   Roy R. Ventura

724.   Melody Violet

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

725.  Marietta Voglis

726.  Jackie Ray Vohs

727.  Gunter Volpel

728.  Richard G. Vrbancic

729.  Robert R. Wade

730.  Shirley E. Wade

731.  Ellen Walls

732.  Joseph P. Walls

733.  Dennis J. Ward

734.  Patricia A. Ward

735.  Carl M. Warfield

736.  Laura W. Warfield

737.  Colleen Weaver

738.  John Weaver

739.  Brigitte S. Weber

740.  Heinrich R. Weber

741.  Norm Webster

742.  Ardis Weible

743.  Dean F. Weible

744.  Jerrold Weinstein

745.  Andrew Welcher

746.  Rosanne Welcher

747.  Lawrence D. Wengert

748.  Dawn M. Wengert

749.  Connie Westbrook

750. Rachel Wheeler

751. Eugene C. Wiehe

752. Barton R. Wilkinson

753. Dianna J. Wilkinson

754. Joy Williams

755. Doris E. Winter

756. Craig Wisch

757. Kathryn Wolfe

758. Larry Wolfe

759. Marlin L. Wonders

760. R. Yvonne Wonders

761. Richard D. Wood

762. Cynthia Work

763. Maryanne H. Worthing

764. Ralph E. Worthing

765. Anthony P. Wynn

766. Sheri J. Wynn

767. Robert J. Yoder

768. Richard L. Younge

769. Joseph G. Zappulla

770. Carol A. Zappulla

771. Ken Zawacki

772. Anthony J. Zerbo

773. Franz J. Zimmer

774. All Other Similarly Situated Direct Lenders Represented By Bickel & Brewer.